Clifton McDONALD, Hermann V. Myers, Sr., William G. McIntyre and Daniel L. Sandy, in their capacities as trustees of and on Behalf of Freight Drivers and Helpers Local Union No. 557 Pension Fund

v.

CENTRA, a Delaware Corporation, General Highway Express, an Ohio Corporation, Central Transport, a Michigan Corporation, GLS Leasco, a Michigan Corporation, Central Cartage, a Michigan Corporation, and Mason and Dixon Tank Lines, a Tennessee Corporation.

Civ. No. S 89–1734.

United States District Court,
D. Maryland.

Aug. 28, 1990.

Anthony A. Abato, Jr., H. Victoria Hedian, Christine Williams, Abato, Rubenstein

& Abato, P.A., Lutherville, Md., for plaintiffs.

Michael A. Nedelman, Patrick A. Moran, Frederic A. Smith, Simpson & Moran, Birmingham, Mich., Frances Kanterman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This is a collection action brought by the Trustees of the Freight Drivers and Helpers Local Union No. 557 Pension Fund ("Fund") against defendants Centra, Inc., General Highway Express, Central Transport, Inc., GLS Leasco, Inc., Central Cartage, Inc. and Mason and Dixon Tank Lines pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "Act"), 29 U.S.C. §§ 1381 et seq.

The Fund seeks payment of a withdrawal liability assessment plus interest, liquidated damages, attorneys fees and costs it claims are due and owing based on the withdrawal of Mason and Dixon Lines, Inc. ("M & D"), from the Freight Drivers and Helpers Local Union No. 557 Pension Fund, a multiemployer pension plan of which it was a member.

The defendants filed a motion to dismiss arguing that this collection action is premature because the Fund failed to afford them notice of their withdrawal liability as required by the MPPAA. Furthermore, they argue, even if the Fund gave them the requisite notice, this action is still premature because they have not been given the 90 day period required by the MPPAA in which to invoke review and arbitration of the withdrawal liability assessment. Defendants claim that the filing of a proof of claim by the Fund and the objection to it by the defendants in the bankruptcy proceedings of M & D equitably tolled the running of this 90 day period. Therefore, they ar-gue, because this suit was filed prior to the bankruptcy court's grant of the Fund's motion to withdraw the claim, this Court must dismiss this action in order to allow them the 90 days in which to request arbitration. The defendants simultaneously contend that if this Court finds that the 90 day grace period was not tolled and that they have, therefore, waived their right to arbitrate the merits of the withdrawal liability assessment, that arbitration would have been inappropriate due to the presence of a question involving a purely legal issue, that is, whether the confirmation of M & D's reorganization plan discharged them from any obligation to pay the assessment.

The Fund has filed a motion for summary judgment, contending that the defendants are jointly and severally liable for the withdrawal liability by virtue of their status as corporations under common control with M & D, that therefore notice to M & D was notice to all and the fact that M & D was a debtor in bankruptcy was irrelevant with regard to the liability of the rest of the defendants. The Fund argues that, in any event, the filing of a proof of claim in bankruptcy court does not toll the statutory period in which to request arbitration, and that because none of the defendants requested review or arbitration this Court must award the withdrawal liability assessment, plus attorneys fees and costs to the Fund.

The Fund also argues that even if this Court dismisses this action and allows the defendants to invoke arbitration, as a separate matter, the full amount of the assessment is due and owing immediately because the defendants failed to make any interim payments as required by §§ 1399 and 1401 of the MPPAA, as requested by the Fund. This award would then be subject to review and modification in arbitration.[1]

Defendants reply that the Fund failed to mention interim payments in their complaint, or to send them a schedule of payments as statutorily required, and that,

---

1. The Pension Benefit Guaranty Corporation intervened in a limited fashion, filing a letter brief dated July 20, 1990.

even if this issue were properly raised, any liability for the payments was discharged in the bankruptcy proceedings of M & D. No oral hearing is deemed necessary on these motions under Local Rule 105(6), D. Md.

For reasons set forth herein, the defendants' motion to dismiss will be *denied*, and the Fund's motion for summary judgment will be *granted*.

## Facts

M & D, a common carrier engaged in interstate trucking, was a member of the Freight Drivers and Helpers Local No. 557 Pension Fund. Pursuant to a collective bargaining agreement entered into with Local Union No. 557, M & D agreed to pay a specified amount of money to the fund for every hour worked by an employee covered by the agreement.

Based on information provided to him by the Fund's actuary, the Contract Administrator of the Fund, Mr. Theodore E. De-Masse, sent a letter to the offices of M & D on August 28, 1984 notifying it of deficiencies in its payments for the periods covering January 1, 1983 through December 31, 1983 and January 1, 1984 through March 31, 1984. On October 2, 1984 M & D responded by letter; requesting from Mr. DeMasse a more particularized account of the precise weeks in which M & D had been found delinquent. One week later, on October 8, 1984, Mr. DeMasse's office responded with a letter explaining that the auditing firm provided to the Fund analyses calculated on a monthly basis, but that if the weekly information was pertinent to M & D's records, M & D should contact the auditing firm directly. There is no indication in the record that M & D did so.

Over a month and a half later, on November 26, 1984, M & D responded by letter through its treasurer, Mr. Hal M. Briand, informing the Fund that M & D had filed for bankruptcy under Chapter 11 nine months earlier, on March 29, 1984, and that, therefore, the assessed deficiencies would be classified as prepetition claims and should be filed with the bankruptcy court. Future correspondence from the Fund was directed to the attorney for "the Debtor." Mr. Briand failed to tell the Fund, however, that the bar date for filing proofs of claim in the bankruptcy proceeding had been set at August 14, 1984, some three months prior to his letter. In fact, M & D had filed a petition for reorganization in the Middle District of North Carolina six months before M & D's initial request to have the deficiencies "clarified." This was the first notification of M & D's bankruptcy received by the Fund.

Upon notification of M & D's bankruptcy proceedings, and the subsequent closing of M & D's Commodity Division, the Fund calculated the assessment for a complete withdrawal from the Fund and sent a letter of notice and demand to M & D on January 11, 1985, claiming $619,101 in withdrawal liability. The Fund explained the procedure to follow in order to qualify for the trucking industry exemption under the MPPAA and the 90 day grace period in which M & D had the right to initiate review and arbitration of the assessment. The Fund also included a schedule of payments to begin 60 days after the date of the letter if M & D failed to institute procedures to qualify for the trucking industry exemption. Finally, the Fund notified M & D that it was filing a proof of claim in the bankruptcy proceeding for the entire amount of the assessment together with an explanation to the bankruptcy court that immediate liability may be avoided if M & D qualified for the trucking exemption. To date, the defendants have neither applied for the trucking industry exemption, sought review of the assessment, nor made any of the scheduled monthly payments.

Because the letter of November 26, 1984, was its first notification that M & D was in bankruptcy proceedings, the Fund had no knowledge when it filed its proof of claim that the bar date for such claim had been set at August 14 of that year. It was also unaware of the relationship among M & D and the defendants. After filing the claim, the Fund received no correspondence from the bankruptcy court or the defendants until March of 1986, some one and a half years later, when Central Transport and

GLS Leasco filed objections to the Fund's proof of claim. At approximately the same time, the bankruptcy court conducted a hearing on M & D's Plan of Reorganization and entered its Order Confirming Restated Joint Plan of Reorganization, on March 29, 1986. Under this Plan, the withdrawal liability claim was to be satisfied by the issuance of a non-voting preferred stock of M & D, of a par value equal to the face value of the Fund's claim, unredeemable for 20 years, with no interest or security. The Fund was never advised of the terms of the Proposed Plan and consequently was not given the opportunity to vote on or object to the Plan. About a month later, M & D filed objections to the Fund's claim.

Pursuant to the bankruptcy procedures for contested claims, Central Transport and GLS Leasco filed discovery requests which totalled 60 pages and amounted to 450 questions. In order to respond to this voluminous request, the Fund asked for two enlargements of time, extending the proceedings into February of 1987. During settlement negotiations, the Fund learned that M & D still was operating in some small degree in its Special Commodities Division, and determined, therefore, that M & D's liability was contingent and could not be calculated until after the three year testing period required by § 4205(b)(1)(A) of the MPPAA.

No determination with respect to the claims had been made by the bankruptcy court by May of 1989, at which time the Fund notified M & D, Central Transport, and GLS Leasco that it was moving to withdraw the claim. As stated in its motion to the bankruptcy court, the Fund by then had ascertained by virtue of the information contained in M & D's Restated Joint Plan of Reorganization that the defendants were in common control with M & D, and accordingly wished to pursue these avenues of recovery of the withdrawal liability.

The bankruptcy court granted the Fund's motion on July 19, 1989 over the joint objections of M & D, Central Transport, and GLS Leasco. This suit had been filed approximately a month earlier, in June of 1989.

In order to answer the questions raised by the parties' motions, the Court must consider the statutory scheme, history, and purpose of this complex statute, as well as a decade of case law concerning these general issues.

### Statutory History

Congress enacted ERISA in order to guarantee that workers employed in the nation's private industries who contracted for a specific pension benefit in exchange for services rendered would, upon fulfillment of their part of the bargain, receive the promised consideration upon retirement. *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980). ERISA was a response to a ten year congressional study that had concluded that the lack of minimum regulatory standards for the maintenance of pension plans with regard to reporting, disclosure, and fiduciary responsibilities had led to financially unsound plans with little chance of meeting the obligations owed to retirees and their dependents.

In fact, it estimated that pension plan failures affected at least twenty thousand workers annually, *see* Employee Retirement Income Security Act of 1974, S.Rep. No. 383, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 5036, and that many of the workers who lost their full pension were only months or even days away from qualifying for retirement, *see* H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4643.

Title IV of ERISA, 29 U.S.C. §§ 1301–1381, created a plan termination insurance program and a wholly-owned government corporation, the Pension Benefit Guaranty Corporation ("PBGC") to administer it. The PBGC was set up to collect insurance premiums from covered pension plans which were then used to help compensate participating employees when a plan terminated with insufficient assets to meet its obligations. *See* §§ 1322 and 1361.

Although the pension plans maintained by a single employer were covered by the insurance program upon ERISA's enactment in 1974, under the statute the PBGC had discretion to pay benefits to a terminated multiemployer plan until 1978, when that obligation became mandatory. *See* § 1381(c)(1). As this date drew nearer, however, Congress realized that there were a number of unstable multiemployer plans, which if terminated, would threaten the solvency of the PBGC. Consequently, Congress deferred the mandatory coverage of these plans for 18 months, during which time the PBGC was to prepare a comprehensive report analyzing the problems unique to the multiemployer plans and recommending appropriate remedial legislation. *Pension Benefit Guar. Corp. v. R.A. Gray*, 467 U.S. 717, 721, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984). The resulting report criticized as ERISA's main shortcoming its failure adequately to protect plans from the adverse consequences resulting from employer withdrawal. *Id.* at 722, 104 S.Ct. at 2714. As the PBGC's then Executive Director explained:

> A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Id.* at 722 n. 2, 104 S.Ct. at 2714 n. 2 (citing *Pension Plan Termination Insurance Issues: Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th Cong., 2d Sess. 22 (1978) (statement of Matthew M. Lind)).

In other words, Title IV of ERISA operated as an incentive for employers to withdraw from financially weak plans. This not only threatened the security of the nation's retirees, but worked an unfair hardship on the remaining employers that were forced to pay more into the plan to fund the accumulated employee vested benefits of the withdrawing employers. *See Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 730 (4th Cir. 1990); H.R. No. 869, Part I, 96th Cong.2d Sess., 54, 60, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2922, 2928. ("[W]ithdrawals ... unfairly burden remaining contributors with unfunded benefit obligations left behind by the withdrawn employer.").

Congress amended ERISA with the MPPAA in 1980 in order to remedy this problem. These amendments require a withdrawing employer from a multiemployer plan to pay its proportionate share of the plan's unfunded vested benefits ("UVBs"), calculated as the difference between the present value of the vested benefits and the current value of the plans assets. *Gray*, 467 U.S. at 725, 104 S.Ct. at 2715 (citing 29 U.S.C. §§ 1381, 1391). In this way, the incentive to evade the obligation to fund the plan is diminished, and where a withdrawal does occur, the resulting liability "safeguards the [remaining] participants in multiemployer plans by requiring a withdrawing employer to fund its fair share of the plan obligations incurred during its association with the plan." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). *See Peick v. Pension Benefit Guar. Corp.*, 539 F.Supp. 1025, 1049 (N.D.Ill.1982), *aff'd*, 724 F.2d 1247 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984) ("MPPAA ... protects the interlocking interests of the PBGC, the premium payers, the withdrawing employers and the vested employees.").

Under the MPPAA, an employer making a complete or partial withdrawal[2] is as-

---

**2.** A partial withdrawal occurs if 1) there is a seventy percent contribution decline for a given

sessed withdrawal liability by the plan sponsor in accordance with one of four methods described in the statute. *See* 29 U.S.C. § 1391.[3]

The plan sponsor is required to notify the employer of the amount of its assessment and the schedule for liability payments, and make a demand for payment according to the schedule, in what has become known in the MPPAA lexicon as a letter of "notice and demand." *See* § 1399.

Special provisions were created where, as here, the withdrawing employer is a member of the trucking industry. Under § 1383(d)(3), such an employer is given 60 days within which either to furnish a bond or set up an escrow account in an amount equal to 50% of the withdrawal liability assessment. In this event, the withdrawal liability can be excused if the PBGC subsequently makes a determination that the employer's withdrawal did not "substantially damage" the contribution base of the pension plan. Where the PBGC determines that the withdrawal did so damage the plan, the bond or escrow is to be paid to the plan sponsor, and the balance becomes due and owing. If the trucking industry employer fails to make such a bond or escrow payment within 60 days, however, withdrawal is deemed to have occurred and the plan sponsor must begin payments according to the schedule set forth in the letter of notice and demand. *See* § 1399(c)(2).

In addition, the statute provides all withdrawing employers with a 90 day grace period within which to initiate a dialogue with the plan sponsor before commencing payment of the liability, in order to review and discuss any disagreements concerning the assessment. § 1399(b)(2)(A)(i). After a "reasonable review of any matter raised," the plan sponsor must notify the employer of its decision. § 1399(b)(2)(B). If the employer disagrees with the plan sponsor's decision, it has another 60 day grace period after the earlier of the date (1)

it is notified of the decision or (2) 120 days after its request for review within which to initiate arbitration. § 1401(a)(1).

During the pendency of any review or arbitration proceeding, the employer must make interim withdrawal liability payments, according to the schedule set out in the sponsor's letter of notice and demand, beginning no later than 60 days after the demand. § 1399(c)(2). If the employer fails to make timely payments (which would be subject to modification if arbitration is requested), it is to be considered "delinquent" within the meaning of § 1145 of the Act. § 1401(d). If arbitration is not initiated within the statutory grace period, the amount calculated by the plan sponsor becomes "due and owing" and is to be paid according to the schedule set out in the notice and demand letter. § 1401(b)(1).

If the employer refuses to pay its liability owed, the plan sponsor may bring a civil action in federal court to collect the assessment. *See* § 1401(b)(1). Where a judgment is entered in favor of the plan sponsor, the court must award attorneys fees, costs and liquidated damages of an amount equal to the accrued interest on the withdrawal liability assessment, along with the assessment. 29 U.S.C. § 1132(g)(2).

### Notice and Demand to Affiliates of a Commonly Controlled Group

Defendants move this Court to dismiss this action, arguing that they were not afforded the statutorily required letter of notice and demand that they claim is a "jurisdictional prerequisite" to collection of the assessment.

The record shows that a notice and demand letter dated January 11, 1985 was received by M & D on January 12, 1985 by certified mail. In their motion to dismiss, the defendants admit that the Fund issued a notice and demand letter dated August 6,

---

plan year, or 2) there is a partial cessation of the employer's contribution obligation. *See* 29 U.S.C. § 1385.

**3.** The MPPAA creates numerous ameliorative statutory exemptions defining circumstances in which reductions in payments to a plan are not

to be considered withdrawals, as well as provisions relieving a withdrawing employer engaged in certain industries or undergoing reorganizations or liquidations from part of its obligation. *See* §§ 1383; 1384; 1385; 1389; 1390; 1398.

1986, but fail to mention the existence of the January, 1985 letter. The January letter includes a schedule of payments, while the August letter does not.[4] The defendants argue that since M & D was in bankruptcy at the time of the receipt of the letter, the demand was void *ab initio* pursuant to 11 U.S.C. §§ 1141(d) and 524(a)(2) as an attempt to collect a prepetition debt outside of the bankruptcy proceeding, and was, therefore, "informational only." Furthermore, they argue, the notice and demand was sent to M & D only and made no mention of the Fund's intention to collect the assessment from the defendants. Consequently, they urge that this action should be dismissed as premature.

The Fund responds that all of the defendants are members of a commonly controlled group with M & D as defined by § 1301, that the notice to M & D was constructive notice to the rest of the group, and that, therefore, as corporations under common control with the withdrawing employer, the defendants are jointly and severally liable for the assessment owed to the Fund. Thus, M & D's bankruptcy is irrelevant to the defendant's liability.

*Commonly Controlled Corporate Group*

Title VI, §§ 1301–1461, of ERISA provides that:

> For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

29 U.S.C. § 1301(b).

The statute then states that the regulations should be consistent and coextensive with the regulations promulgated by the Treasury Department under 26 U.S.C. § 414(c) that define "trades or businesses under common control."[5]

**4.** This obviously is their basis for contending that the Fund never sent them a schedule of payments and that, therefore, interim payments were not required. Curiously, however, in their Answer to the Plaintiffs' Motion for Summary Judgment, the Defendants admit that they received the January letter but argue that it also was *void ab initio*. Like many of the Defendants' contentions, these are not merely arguments in the alternative, but rather mutually exclusive arguments that undercut the force of each other.

**5.** Treasury Regulation Section 11.–414(c)–(1)(a) provides in pertinent part:
> [T]he term "two or more trades or businesses under common control" means any group of trades or businesses which is either a "parent-subsidiary group of trades or businesses under common control" …, a "brother-sister group of trades or businesses under common control" …, or a "combined group of trades or businesses under common control".… For purposes of this section …, the term "organization" means a sole proprietorship, a partnership …, a trust, an estate, or a corporation.

Section 11.414(c)–1(b) defines "parent-subsidiary group of trades or businesses under common control" as
> one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if
> (i) A controlling interest in each of the organizations, except the common parent organization, is owned by one or more of the other organizations; and (ii) The common parent organization owns a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership in interest by such other organizations.
> (2) Controlling interest defined—(i) Controlling interest. For purposes of paragraphs (b) and (c) of this section, the phrase "controlling interest" means:
> (A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.

Section 11.414(c)–2(c)(1) defines a "brother-sister" group as
> [T]wo or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own … singly or in combination, a controlling interest of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

Finally, section 11.414(c)–2(c)(2) provides that persons are in "effective control" if
> (i) In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock

The principal case discussing the liability of "trades or businesses under common control" is *Pension Benefit Guar. Corp. v. Ouimet,* 470 F.Supp. 945 (D.Mass.1979), *aff'd,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981). In *Ouimet,* two wholly-owned subsidiaries of the Ouimet Corporation that had maintained single employer pension plans covered by ERISA declared bankruptcy. Both of the plans were underfunded at the time of the bankruptcy. The PBGC, which was obligated to insure the plan, sought reimbursement from the corporate parent and general affiliates. It argued that these entities were jointly and severally liable for the deficit because they were all members of a group under "common control", as defined by 29 U.S.C. § 1301(b)(1). The defendants responded that it would be inequitable to hold them responsible for the underfunding of a plan to which they did not contribute.

The court rejected the defendants' contention, holding that the plain language of the statute as well as clear Congressional intent mandated the conclusion that all members of an ERISA commonly controlled group are liable for the withdrawal liability of a withdrawing affiliate. *Id.* at 950–53. It concluded that: .

> Application of the controlled group liability theory fosters [the voluntary continuation and maintenance] of private pension plans by preventing employers from using corporate segmentation as a shield from termination liability. The statute reflects Congress' judgment that, without controlled group liability, businesses could juggle their activities to eviscerate the termination liability provisions of ERISA.

*Id.* at 955.

The First Circuit agreed with the district court's interpretation of the common control provision and affirmed its decision. *Pension Benefit Guar. Corp. v. Ouimet,* 630 F.2d 4 (1st Cir.1980), *cert. denied,* 450

U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).

When Congress passed the MPPAA in 1980 it reaffirmed the applicability of the commonly controlled group concept in the context of a multiemployer plan, explicitly approving the decision in *Ouimet.* Senator Williams, one of the principal sponsors of the MPPAA, stated:

> Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability.

126 Cong.Rec. 23,287 (Aug. 26, 1980).

Other courts have recognized that the controlled group concept was designed to "prevent a business from limiting its responsibilities under ERISA by fractionalization of its business operations," *Pension Benefit Guar. Corp. v. Center City Motors, Inc.,* 609 F.Supp. 409, 412 (S.D.Cal. 1984), as well as to "preclude solvent employers from attempting to shift the responsibility to continue funding the pension plan to the government (PBGC) or the plan itself." *Robbins v. Pepsi–Cola Metro. Bottling Co.,* 636 F.Supp. 641, 661 (N.D.Ill. 1986) (citing *In re Challenge Stamping & Porcelain Co.,* 719 F.2d 146, 151 (6th Cir. 1983)). *See Connors v. Calvert Development Co.,* 622 F.Supp. 877, 882 (D.D.C. 1985) ("In enacting 1301(b)(1), Congress intended to prevent such evasion of ERISA through the abuse of the structural formalities of overlapping business organizations.").

The legislative history of ERISA also demonstrates that § 1301(b) was enacted to prevent a corporation from shirking its responsibility by fractionalizing its operations:

> The committee ... intends to make it clear that the coverage and antidiscrim-

---

entitled to vote of such corporation or more than 50 percent of the total value of shares of all classes of stock of such corporation.

Because the PBGC has not yet issued regulations on the matter, courts apply these provisions when discussing common control.

ination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation.

S.Rep. No. 383, 93d Cong., 2d Sess. 43, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4890, 4928.

■■■■ If the defendants are members of a commonly controlled group with M & D, notice to M & D is notice to all of the defendants because all members of a commonly controlled group, are, effectively, one employer for purposes of the § 1399 notice requirement. *See, e.g., IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 123 (3d Cir.1986); *Bd. of Trustees v. H.F. Johnson, Inc.,* 830 F.2d 1009, 1013 (9th Cir.1987); *Connors v. Brady–Cline Coal Co.,* 668 F.Supp. 5, 9 (D.D.C.1987); *Central States, Southeast and Southwest Areas Pension Fund v. Skyland Leasing Co.,* 691 F.Supp. 6, 13 (W.D.Mich.1987), *aff'd,* 892 F.2d 1043 (6th Cir.1990); *Pepsi–Cola,* 636 F.Supp. at 655; *Calvert Development,* 622 F.Supp. at 881 (D.D.C.1985). Moreover, the burden of coming forward with information disclosing commonly controlled entities logically is placed on the employer, because the constantly changing ownership interests of a withdrawing employer are known to the corporation but not to the pension plan. *See Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Central Transport, Inc.,* 888 F.2d 1161, 1163 n. 3 (7th Cir.1989); *Barker & Williamson,* 788 F.2d at 128 (3d Cir.1986).

■■■ Thus, if all of the defendants are members of a commonly controlled group and M & D received § 1399 notice, all of the defendants are jointly and severally liable for withdrawal liability. *See I.A.M. Nat'l Pension Fund v. Slyman Indus.,* 901 F.2d 127, 129 (D.C.Cir.1990); *H.F. Johnson,* 830 F.2d at 1013; *Central States,*

*Southeast and Southwest Areas Pension Fund v. Lloyd L. Sztanyo Trust,* 693 F.Supp. 531, 540 (E.D.Mich.1988); *In Re Northeast Dairy Coop. Fed'n, Inc.,* 88 B.R. 21, 23 (Bankr.N.D.N.Y.1988). Under the principles of joint and several liability, the Fund can sue one or more of the defendants and can collect the entire judgment from one or more of them. *See Sztanyo Trust,* 693 F.Supp. at 540; *Ouimet Corp.,* 630 F.2d at 11; *Connors Development,* 622 F.Supp. at 881.

The Fund argues that at the time of the January 1985 notice and demand letter, M & D was the wholly-owned subsidiary of Central Transport and its "sister" affiliate, GLS Leasco, and that both Central Transport and GLS Leasco were wholly-owned subsidiaries of Centra, Inc. It offers in support of this contention documents obtained from the Interstate Commerce Commission and the Michigan Department of Commerce, the Reorganization Plan of M & D, detailing the various mergers and acquisitions among the defendants, as well as the court decisions in *Central Transport,* 888 F.2d 1161 (7th Cir.1989) and *Mason & Dixon Tank Lines v. Central States, Southeast and Southwest Areas Pension Fund,* 852 F.2d 156 (6th Cir.1988), concluding that the Defendants were affiliates. Defendants, on the other hand, "neither admit nor deny that they were corporations under common control" but argue that the Fund's proof on this point is insufficient to support the inference that the defendants were under common control on December 31, 1987, the date defendants claim is the date the Pension Fund claims is the date of their alleged withdrawal.[6] The defendants also include in their opposition to the Fund's motion for summary judgment an affidavit from R.W. Leach, the Vice President of Central Transport which declares that "Central Transport, Inc., did not own any stock of the Mason and Dixon Lines,

---

6. Defendants claim that the relevant withdrawal date is December 31, 1986, at which time the Fund had determined that the withdrawal was partial rather than complete. According to the MPPAA, however, if no review or arbitration is requested within the statutory time period, the withdrawal becomes due and owing based on the date and amount set forth by a plan sponsor in its notice and demand *See* § 1401(b)(1). In any event, this determination is to be made in arbitration. *See Republic Indus., Inc. v. Teamsters Joint Council No. 83,* 718 F.2d 628, 635 (4th Cir.1983).

Inc. on or after March 30, 1986." The Fund replies that the affidavit has no bearing on the issue of common control because the stock of M & D that was owned by Central Transport simply was cancelled and reissued to Centra pursuant to the restructuring terms of M & D's reorganization.

■ Although it seems beyond dispute, or, at least, genuine dispute, that defendants are under common control with M & D, it is clear that the determination "whether a group of entities is under common control involves largely a factual determination" to be made within the broader context of a withdrawal liability dispute and is, therefore, one to be made in arbitration before resort to federal court. *Trustees of the Amalgamated Insur. Fund v. Abraham Zion Corp.*, 686 F.Supp. 95, 97 (S.D.N.Y.1988). *See T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir.1985) ("Act subjects to arbitration factual issues the resolution of which is necessary to calculate withdrawal liability."); *see also* PBGC Opinion Letter 85–5 (Jan. 30, 1985) ("[I]t is the plan sponsor's responsibility in the first instance to determine whether a withdrawal has occurred *and the identity of the liable employer.* Disputes arising over such withdrawal liability determinations must be resolved under the dispute resolution procedures of [29 U.S.C. §§ 1399 and 1401].'"). (emphasis added).

Consequently, the Defendants must convince this Court that they should have recourse to arbitration despite their admitted failure to have invoked this forum according to the statutory scheme.

### Arbitration Under the MPPAA

Defendants argue that they should be able to dispute the merits of their withdrawal liability in arbitration after the running of the statute's grace periods by virtue of the Fund's filing of and the defendants objections to a proof of claim for the withdrawal liability in M & D's bankruptcy proceedings. The defendants claim that the statutory grace period for invoking arbitration is not a jurisdictional prerequisite to contesting withdrawal liability in federal court and that the bankruptcy court was a proper forum for the resolution of the assessment. Furthermore, they argue, because the Fund filed the claim during the grace period and then withdrew from the proceedings prior to the bankruptcy court's resolution of the claim, the grace period within which to request arbitration should be tolled and they should have 90 days to request it.

The Fund argues that request for arbitration within the statutory period is mandatory if an employer wishes to contest a withdrawal liability assessment, and because the defendants had adequate notice and failed to initiate review and arbitration, the assessment is now due and owing, according to § 1401(b)(1). The Fund also contends that equitable tolling is inconsistent with congressional intent underlying the MPPAA and is, therefore, unavailable to the defendants. Furthermore, they argue that even if tolling is allowed in some narrow circumstances the facts of this case do not warrant the imposition of this equitable doctrine.

### Arbitration Under § 1401

■ Despite the fact that it is well-settled in the circuits that under the MPPAA "arbitrate first is indeed a rule Congress stated unequivocally," *Grand Union Co. v. Good Employers Labor Relations Ass'n.*, 808 F.2d 66, 70 (D.C.Cir.1987), that "arbitration" reigns supreme," *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 422 (D.C.Cir.1987), and that its utilization is "compulsory," *Central States, Southeast and Southwest Areas Pension Fund v. T.I.M.E.–DC, Inc.*, 826 F.2d 320, 327 (5th Cir.1987), the provisions of § 1401 uniformly have been analogized to statutory provisions requiring a party to utilize administrative agency procedures prior to resort to court. Thus, courts have construed the arbitral provision as a prudential rather than a jurisdictional prerequisite and, therefore, one to which principles governing the doctrine of exhaustion of administrative remedies apply. *See, e.g., I.A.M. Nat'l Pension Fund Benefit Plan C*

*v. Stockton Tri Indus.,* 727 F.2d 1204, 1207–09 (D.C.Cir.1984); *T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds,* 756 F.2d 939, 944–45 (2d Cir.1985); *Central States, Southeast and Southwest Pension Fund v. 888 Corp.,* 813 F.2d 760, 764 (6th Cir.1987); *Robbins v. Admiral Merchants Motor Freight, Inc.,* 846 F.2d 1054, 1056 (7th Cir.1988); *Crown Cork & Seal Co. v. Central States, Southeast and Southwest Areas Pension Fund,* 881 F.2d 11, 19 (3d Cir.1989).

The doctrine of exhaustion of administrative remedies admits of many exceptions, and, therefore, some courts have allowed a party disputing withdrawal liability to file a suit in federal court before engaging in arbitration in order to determine if one of the exceptions applies. Initially, Defendants here raised no exception to the doctrine, but, rather, used the fact that courts have not considered arbitration a jurisdictional prerequisite to argue that the bankruptcy court was a legitimate forum to contest their liability.[7] Although mindful of the settling and predictive value of precedent,[8] after careful consideration of the plain meaning of the statutory language of the MPPAA, the Congressional purpose motivating its enactment, the applicability of the doctrine of administrative exhaustion to the arbitration provisions of the Act—in theory, and as applied by the courts in the MPPAA's ten year history— as well as recent Supreme Court case law concerning the viability of arbitration as an alternative forum for dispute resolution, the Court is compelled to hold that administrative exhaustion jurisprudence is inappropriate in construing the arbitral provisions of the MPPAA, and, therefore, these provisions are more appropriately construed as a jurisdictional prerequisite.[9]

Thus, this Court will conclude that resort to federal court to dispute withdrawal liability may not be had unless a withdrawing employer invokes review and arbitration within the statutory grace periods outlined in the MPPAA.

### The Text of § 1401

When construing a statute, a court's goal is to "ascertain the Congressional intent and give effect to the legislative will." *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Because there is a presumption that the legislative purpose is expressed in the ordinary meaning of the words used, the starting point in this task is the text of

---

7. It was not until later in the pleading stages that the Defendants formulated an argument based on a standard exception.

8. The Court uses the term "precedent" rather loosely in this context, however, because, as the following discussion illustrates, the doctrine of exhaustion makes it impossible, for employers and plan sponsors alike, to predict what a court's decision is likely to be under any given circumstances.

9. Defendants cite *Republic Indus., Inc. v. Teamsters Joint Council,* 718 F.2d 628 (4th Cir.1983) for the proposition that the MPPAA's arbitration requirement is prudential rather than jurisdictional. Although the court did not discuss this issue, defendants apparently base their conclusion on the fact that the court tolled the grace period for initiating arbitration during the pendency of the case in district and circuit court. In *Republic,* however, the employer was challenging the facial constitutionality of the MPPAA. *Id.* at 634–44. The court reasoned that because the arbitration provisions were limited to disputes involving the determination, calculation and collection of withdrawal liability, a facial constitutional attack was not within the authority of an arbitrator to decide. It, therefore, held that:

> We think it equitable that when Republic has made a not frivolous challenge to the constitutionality of the arbitration procedures, the validity of which has not heretofore been definitively decided, the pendency of the litigation should toll the running of the period prescribed in § 1401(a)(1)(B).

*Id.* at 644.

The Supreme Court has explicitly recognized that a jurisdictional prerequisite may be circumvented to challenge the facial constitutionality of the statute. *See Weinberger v. Salfi,* 422 U.S. 749, 761, 95 S.Ct. 2457, 2464, 45 L.Ed.2d 522 (1974).

Because Defendants do not now challenge the facial constitutionality of the statute, *Republic* is inapt. This does not mean, however, that a court will condone "frivolous constitutional challenges [to] the MPPAA as a method of bootstrapping their dilatory calculation claims." *Centennial State Carpenters Pension Trust Fund v. Woodworkers of Denver, Inc.,* 615 F.Supp. 1063, 1069 (D.C.Colo.1985). (Of course, these circumstances are not present here, as Defendants raise no constitutional claims.)

the statute itself. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *see also United States v. Harvey*, 814 F.2d 905, 913 (4th Cir.1987). The text is controlling unless it is shown to be ambiguous or divergent from clearly expressed Congressional intent. *Harvey*, 814 F.2d at 913, *citing Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983). As a final check in the analysis, a court may consider the ramifications of a less literal reading of the statute to ascertain the effect on its legislative purpose. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 818–22, 100 S.Ct. 2486, 2493–95, 65 L.Ed.2d 532 (1979).

Section 1401(a)(1) states

*Any dispute* between an employer and the plan sponsor of a multiemployer plan concerning a determination made under Section 4201 through 4219 [29 U.S.C. §§ 1381–1399] *shall be resolved through arbitration.* Either party may initiate the arbitration proceeding within a 60 day period after the earlier of—

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or

(B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title. (emphasis added).

Sections 1381–1399 discuss the criteria for the imposition of withdrawal liability along with the various exemptions and factors to be considered in reducing an assessment.

Subsection (a)(2) provides that the PBGC promulgate regulations regarding the arbitration proceedings. Subsections (a)(3)(A) and (a)(3)(B) provide that determinations concerning withdrawal liability by a plan sponsor be presumed correct by the arbitrator unless the employer shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous, or, in the case of a calculation of unfunded vested benefits, that the calculation methods were unreasonable or the product of a "significant error."

Subsection (b)(1), titled *"Alternative* collection proceedings" (emphasis added),

states that if arbitration has not been initiated pursuant to the statutory time frame, the assessment demanded by the plan sponsor in its notice and demand letter "shall be due and owing" on the schedule set forth in the letter. It then provides that the sponsor *may* bring an action in state or federal court to collect the amount. (emphasis added).

Subsection (b)(2) provides that *"upon completion of the arbitration proceedings"* (emphasis added) the parties to the arbitration may appeal to federal court. Subsection (b)(3) vests arbitrators with the same powers as those conducting proceedings under Title 9. Subsection (c) provides that the arbitrator's findings of fact are to be presumed correct on appeal. Finally, subsection (d) provides that a withdrawing employer must make payments according to the plan sponsor's letter of notice and demand until the arbitrator renders a decision.

Pursuant to subsection (a)(2), the PBGC has promulgated detailed procedures for the arbitration of withdrawal liability disputes. *See* Arbitration of Disputes in Multiemployer Plan, 29 CFR §§ 2641.1–2641.3 (1989). Most notable of the specific provisions are those that ensure an expedited resolution of the dispute by mandating specific time limits on the selection of an arbitrator (45 days), selection of a date for a hearing (15 days after arbitrator selected), the date of the hearing (no later than 50 days after arbitrator acceptance), and the date of an award (no later than 30 days after proceedings close).

Although it is often the case that legislative drafting in general, and ERISA in particular, leaves much to be desired in the way of clarity, the language of § 1401 hardly could be more straight forward. *See Coles Express v. New England Teamsters & Trucking Indus. Trucking Fund*, 702 F.Supp. 355, 360 (D.Me.1988).

It is clear from the language and the structure of § 1401(a)(1) that *all* disputes over withdrawal liability determinations made by a plan sponsor are to be reviewed and arbitrated *within the statutory grace period.* If this is not done, the assessment

becomes final and is due and owing and can then be collected *via* the "alternative" proceeding in federal court. Only where there has been resort to arbitration in the first instance may a party dispute withdrawal liability in federal court.

That Congress intended the parties first to resort to arbitration is also evidenced by the statute's provisions that direct parties to the federal courts *"upon completion of arbitration,"* § 1401(b)(2), and that require reviewing courts to presume that an arbitrator's factual findings are correct, § 1401(c), *see I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d at 415, 417 n. 3 (D.C.Cir.1987).

Furthermore, Congress provided a completely separate section governing all other disputes arising under the MPPAA. *See* § 1451. As the Court of Appeals for the District of Columbia Circuit put it:

> From the language and structure of the statute, it appears that Congress designed the informal procedures to avoid the delay and expense in obtaining payment that pension plan sponsors would suffer were more formal proceedings required as a first step in resolving liability disputes. This intent to bring about expeditious resolution of such disputes is evident in the brief periods prescribed for plan sponsors to make determinations of withdrawal liability, notify employers of such determinations, and review those determinations.

*Clinton Engines Corp.*, 825 F.2d at 415, 426 (D.C.Cir.1987). Thus, the plain meaning of the statute leads this Court to conclude that "the legislature's decision [was] that arbitration, and not the courts, is the proper forum for the initial resolution of disputes...." *Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 295 (3d Cir.1982).

An investigation of the legislative history of the MPPAA reveals that the Congressional intent behind the statute is furthered, not hampered, by a literal reading of the statute. In fact, it is obvious that the expeditious nature of arbitration is precisely why that forum was chosen to resolve withdrawal liability disputes in the first instance.

### The Legislative History of § 1401

The longer a withdrawing employer's liability remains in dispute, the greater the risk to the solvency of a plan and the greater the financial burden to the plan's remaining employers. The inefficacy of the collection process was a major factor in the enactment of the MPPAA:

> Recourse available under current law for collecting delinquent contributions is insufficient and unnecessarily cumbersome and costly. Some simple collection actions brought by plan trustees have been coverted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions. This should not be the case. Federal pension law must permit trustees of plans to recover delinquent contributions efficaciously.

Senate Labor Committee, Summary and Analysis of S. 1076 (April 1980), *reprinted in* BNA Pension Reporter, Supp. No. 310 (Sept. 29, 1980), at 91.

Many courts have concluded, then, that the "provisions for informal, expeditious resolution of withdrawal liability disputes were at the heart of the MPPAA." *Teamsters Pension Trust Fund v. Allyn Transp. Co*, 832 F.2d 502, 504 (9th Cir. 1987). *See Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1244 (3rd Cir.1987) ("Provisions for the quick and informal resolution of withdrawal liability disputes are an integral part of MPPAA's statutory scheme"); *Marvin Hayes Lines, Inc. v. Central States Southeast and Southwest Areas Pension Fund*, 814 F.2d 297, 301 (6th Cir.1987) ("[I]t is clear from a reading of the statutory sections dealing with withdrawal liability that the intent of Congress was to secure the funds as soon as possible and iron out the details and disputes later.").

In fact, when the bill passed the House it did not contain an arbitration provision. *See* 126 Cong. Rec. 12,180–224 (1980). Originally, the bill contemplated that the

liability was to be calculated by the plan and that the employer would have no opportunity to request a review or initiate arbitration on the matter. *See* H.R. Report No. 869, 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2950–54. What is currently § 1401 appeared for the first time in a proposed Senate amendment to the bill. *See* 126 Cong.Rec. 20,157. According to a joint explanation of the arbitration provision:

> Employer challenge to a plan's determination of withdrawal liability or unfunded vested benefits.
>
> Under the bill, an employer is permitted to challenge a plan's determination of withdrawal liability or of unfunded vested benefits. Such disputes are subject to compulsory arbitration. In the resolution of the dispute, the plan is treated as having met its burden of proof with respect to its unfunded vested benefits if certain standards are satisfied. Pending the resolution of the dispute, the employer is required to pay withdrawal liability as originally determined by the plan, but the failure to pay an installment before the arbitration is concluded would not accelerate payment of future installments. Any party to the arbitration may bring an action in the United States district court to enforce, vacate or modify the arbitrator's award. In the court proceeding, there is to be a rebuttable presumption that the arbitrator's findings of fact were correct.
>
> Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 96th Cong., 2d Sess., *reprinted in* 126 Cong.Rec. 20,189, 20,198 (1980).

The amendment was not well received in the House and the House manager of the bill, Representative Thompson, introduced an amendment that would essentially have restored the bill to the form in which it had passed the House. *See* 126 Cong.Rec. 20,-842–975. When the House reconvened, however, Representative Thompson submitted an amendment with the arbitral provisions intact. *Id.* at 23,017.

Obviously the result of a compromise, the arbitration provision provided the employers the right to contest the assessment before it became due and owing, and an expeditious forum within which to do so. Viewed in such a light, the provision actually cut down on the harshness of the original scheme to the withdrawing employer.

It is also obvious that "the value of arbitration in fulfilling Congress' intent to provide an efficient, expeditious dispute resolution mechanism lies in *initial* resort to that mechanism." *Clinton Engines Corp.,* 825 F.2d at 427 (emphasis in original). *See Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 814 F.2d 297, 301 (6th Cir. 1987) (disputes concerning withdrawal liability "are to be resolved by the arbitral process provided within the statutory scheme and are not issues for the courts prior to arbitration."); *Combs v. Adkins & Adkins Coal Co.,* 597 F.Supp. 122, 126 (D.D.C.1984) (employers forfeit their opportunity to contest withdrawal liability assessment when they ignore clear statutory requirements for resolution of these disputes). Indeed, it is manifest that the selection of a forum that can be invoked within a prescribed time period and that can be regulated to ensure expedited scheduling and resolution was as an important a component of the MPPAA as the imposition of lia-bility in the first place. *See Flying Tiger Line,* 830 F.2d at 1248–49 ("Congress clearly designed MPPAA so that the court will be the final forum for dispute resolution, and MPPAA's purposes would be undermined by the expense and delay that would be involved if litigation occurred prior to the Act's dispute resolution procedures.").

Thus, the court finds that the language of the provisions does not diverge from the intent of the statute. *See Teamsters Pension Trust Fund v. Allyn Transp. Co.,* 832 F.2d 502, 505–06 (9th Cir.1987) ("Congress clearly intended exactly what [its] words import.").

### The Inapplicability of the Doctrine of Administrative Exhaustion to the MPPAA

The conclusion that resort to arbitration within the statutory grace period is a juris-

dictional prerequisite is further buttressed by a retrospective analysis of the perverse effect that the application of the doctrine of administrative remedies has had on MPPAA's legislative purpose.

A brief summary of the origin and purpose of this doctrine reveals the reasons for its inutility as an analytic tool in this context and why the courts have come to anomalous results in their withdrawal liability jurisprudence.

The doctrine of the exhaustion of administrative remedies must be viewed from the historical perspective that questions of executive administrative agencies' powers in dispute resolution have traditionally been decided by Article III courts.[10] While the Supreme Court has upheld the constitutionality of Congressionally-created administrative tribunals under certain circumstances, *see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67, 102 S.Ct. 2858, 2869, 73 L.Ed.2d 598 (1982), the judicially-created exhaustion doctrine functions as a prudential rule that furnishes the courts "with a method to exercise comity toward administrative agencies and to promote efficient use of judicial resources while protecting the rights of parties who have come before the court seeking relief." *Morrison–Knudsen Co., Inc. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1223 (9th Cir.1987).

■■■■ The decision whether to require a party to utilize the statutory provisions for resolution of a dispute in an administrative forum is to be made "with a regard for the particular administrative scheme involved," *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975). Thus, a court's decision to entertain a case before the parties exhaust the administrative procedures provided for in an agency's regulations depends upon an evaluation of whether the Congressional purposes for establishing the agency would be furthered, balanced against the interests of private parties in finding adequate redress. *See Shelter Framing Corp. v. Pension Benefit Guaranty Corp.*, 705 F.2d

1502, 1509 (9th Cir.1983), *rev'd on other grounds*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Morrison–Knudsen*, 811 F.2d at 1223; *Wong v. Department of State*, 789 F.2d 1380, 1384 (9th Cir.1986).

■■■ Courts typically weigh in the balance an agency's need for administrative autonomy, *see, e.g., McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969), the preservation of the separation of powers, *see, e.g., Montgomery v. Rumsfeld*, 572 F.2d 250, 253 (9th Cir.1978), the need for judicial economy, *see, e.g., Bethlehem Steel Corp. v. EPA*, 669 F.2d 903, 907 (3d Cir.1982), avoidance of administrative inefficiency arising from requiring the agency to engage in piecemeal litigation, *McKart*, 395 U.S. at 194, 89 S.Ct. at 1663, allowing an agency to correct its own errors, *see, e.g., Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972) and the benefit to the reviewing court of an agency's superior expertise on factual issues, *see, e.g., Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). For instance, in *United States v. Newmann*, 478 F.2d 829 (8th Cir.1973), the court elicited from Supreme Court caselaw:

> "a balancing test which weighed the interests of the registrant against three specified governmental interests requiring exhaustion ... (a) the agency's interest in having an opportunity to make a factual record and exercise its discretion and expertise without the threat of litigious interruption; (b) the agency's interest in discouraging frequent and deliberate flouting of the administrative process; and (c) the agency's interest in correcting its own mistakes and thereby obviating unnecessary judicial proceedings."

*Id.* at 831.

Where none of these interests is implicated, courts, in their discretion, have tended to excuse adherence to the statutory scheme for dispute resolution. *See, e.g.,*

---

**10.** Indeed, read literally, Article III prohibits Congress from delegating any adjudicatory power to Article I entities. *See Commodity Futures*

*Trading Comm'n v. Schor*, 478 U.S. 833, 859, 106 S.Ct. 3245, 3261, 92 L.Ed.2d 675 (1986) (Brennan, J., dissenting).

*Central States Pension Fund v. 888 Corp.*, 813 F.2d 760, 764 (6th Cir.1987); *T.I.M.E.–DC v. Management–Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir.1985); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1209–10 (D.C.Cir.1984); *I.A.M. Nat'l Pension Fund v. Schulze Tool & Die Co., Inc.*, 564 F.Supp. 1285, 1294 (N.D.Cal. 1983).

Because these interests are, for the most part, far removed from the context of a non-executive, private arbitration forum, it is easy to see that a court would rarely require exhaustion. More importantly, however, the interest served by requiring arbitration in the first instance—maintenance of plan stability through expeditious and efficacious collection of withdrawing employers' outstanding obligations—never gets weighed in the balance. This ignores the primary purpose of the MPPAA.

█ Even where the policies underlying the doctrine requiring exhaustion are implicated, however, courts will allow the parties to circumvent the administrative process based on a number of well-settled exceptions to the exhaustion requirement that address an administrative agency's inability to provide a party with adequate redress.

Not surprisingly, then, employers have contended that one or more of these exceptions is applicable in an effort to circumvent the arbitral provisions of the MPPAA. Because of the inapplicability of these exceptions to the arbitral scheme, courts more often than not have accepted the case in order to review the merits of the exception, only to decide that an exception was not warranted. This practice has a detrimental effect on both the efficacy of the MPPAA in protecting the solvency of pension plans and the employer disputing the assessment. Because the employer is allowed to evade the mandatory grace period for invoking and utilizing arbitration, the Fund is unable to collect the liability owed and add it to the assets of the pension plan until the court decides whether an exception applies, or, in cases where the court finds that no exception applies but remands

the dispute to arbitration, until the issue is arbitrated, or perhaps not until it is again reviewed in district court on appeal. On the other hand, an employer that bypasses arbitration and files first in district court, relying on the traditional exceptions to exhaustion, is left without a forum to dispute the withdrawal liability if the court finds the exception inapplicable in the arbitral context, because, by then, the 90 day grace period has inevitably expired.

█ Exceptions to the doctrine requiring administrative exhaustion are most often recognized where 1) the dispute involves legal rather than factual issues, 2) the utilization of the administrative procedures would lead to irreparable injury, and 3) the resort to the administrative procedures would be futile.

### The Statutory Construction Exception

█ In the early MPPAA cases, courts uniformly held that arbitration was not required where the issue to be decided was based on statutory construction, relying on the traditional exception to exhaustion that recognized that administrative agencies are constituted for their factual, not legal, expertise. *See, e.g., I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1210 (D.C.Cir.1984); *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund*, 560 F.Supp. 294, 302 (E.D.N.Y.1983); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Schulze Tool & Die Co.*, 564 F.Supp. 1285, 1294 (N.D.Cal.1983); *see also, Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp.*, 813 F.2d 760, 764 (6th Cir.1987); *Central States, Southeast and Southwest Areas Pension Fund v. Skyland Leasing Co.*, 691 F.Supp. 6, 14 (W.D.Mich.1987), aff'd, 892 F.2d 1043 (6th Cir.1990).

In the past few years, however, courts have concluded that arbitrators are fully qualified to decide legal as well as factual issues, and that to except from arbitration issues involving statutory interpretation "would drastically diminish the prime role Congress so plainly assigned to arbitration in the MPPAA dispute resolution scheme."

*Grand Union Co. v. Food Employers Labor Relations Ass'n,* 808 F.2d 66, 70 (D.C. Cir.1987). *See Mason and Dixon Tank Lines v. Central States, Southeast and Southwest Areas Pension Fund,* 852 F.2d 156, 163–65 (6th Cir.1988); *Allyn Transp. Co.,* 832 F.2d at 502, 504 (9th Cir.1987); *Clinton Engines,* 825 F.2d at 415, 418 (D.C.Cir.1987); *Flying Tiger Lines v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1253–55 (3d Cir.1987); *Central States, Southeast and Southwest Areas Pension Fund v. Houston Pipe Line Co.,* 713 F.Supp. 1527, 1530 (N.D.Ill.1989).

The legislative history also supports this conclusion. When Rep. Frank Thompson, floor manager of the bill, presented the MPPAA to the House, he stated that "[t]he committees intend that the role of the arbitrator under this Act will be similar to that of judge applying applicable law to the facts presented...." 26 Cong.Rec. 23,039 (1980).

Furthermore, recent Supreme Court decisions serve to illustrate the changing attitude of the courts toward the legitimacy and competency of arbitration under the Federal Arbitration Act (FAA) as a viable alternative dispute resolution forum for legal as well as factual matters. Citing federal policy favoring arbitration, the Court in *Shearson/American Express v. McMahon,* 482 U.S. 220, 226–27, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185 (1987), held that an arbitrator under the FAA is fully competent to hear claims founded on statutory rights. In *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the Court previously had recognized the competency of arbitral tribunals in handling "the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision," *Shearson,* 482 U.S. at 232, 107 S.Ct. at 2340, and that the "streamlined procedures of arbitration do not entail any consequential restriction on substantive rights," *id.* The Court concluded that "we are well past the time when judicial suspicion of the desira-

bility and the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi,* 473 U.S. at 626–27, 105 S.Ct. at 3354.

Not only does § 1401(b)(3) vest MPPAA arbitrators with the same powers as those conducting proceedings under the FAA, the PBGC regulations provide under the subtitle "Application of the law" that:

> In reaching his [sic] decision, the arbitrator shall follow applicable law, as embodied in statutes, regulations, court decisions, interpretations of the agencies charged with the enforcement of the Act, and other pertinent authorities.

29 C.F.R. § 2641.4 (1989).

Thus, this Court agrees that "it should be beyond cavil that the existence of an issue of statutory interpretation, standing alone, does not justify bypassing arbitration." *Clinton Engines,* 825 F.2d at 418.[11]

### *The Irreparable Injury Exception*

■ Courts analyzing the arbitrability of withdrawal liability disputes have also recognized, but rarely applied, the irreparable injury exception to the exhaustion doctrine in the arbitral context. *See, e.g., Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 293 (3d Cir.1982); *Marvin Hayes,* 814 F.2d at 300; *Flying Tiger Line, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 659 F.Supp. 13, 15–16 (D.Del.1986), *aff'd,* 830 F.2d 1241 (3d Cir.1987). This is because the traditional circumstances warranting this exception, where the administrative proceeding is so protracted as to cause irreparable loss, are absent in the MPPAA arbitral context, where the resolution of the dispute will be had much more quickly.

Therefore, employers seeking judicial review without first resorting to arbitration, arguing that the financial burden of the proceeding would cause irreparable injury, have been rebuffed on the principle that

---

**11.** The foregoing analysis disposes of Defendants' claim that their statutory issue could not be decided by an arbitrator.

the additional pecuniary hardship and delay attendant to administrative exhaustion does not constitute irreparable injury. *See, e.g., Terson Co. v. Pension Benefit Guar. Corp.,* 565 F.Supp. 203, 207 (N.D.Ill.1982) ("mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough") (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974)); *Cf. Graphic Communications Union v. Chicago Tribune Co.,* 779 F.2d 13, 15 (7th Cir.1985) ("[T]he fact that an order to arbitrate imposes a cost, the cost of the arbitration, whether it is an opportunity cost of time or an out-of-pocket expense for lawyers or witness fees or whatever, or both types of costs, does not show irreparable harm. Otherwise every order to arbitrate would be deemed to create irreparable harm, and it would be easy to get such orders stayed.").

The inapplicability of this exception to the withdrawal liability dispute context is highlighted in *Flying Tiger Line,* 659 F.Supp. 13. The district court at first had found that the employer disputing its liability would suffer irreparable injury if it had to arbitrate the issue of whether it was an "employer" under the Act and held that it would decide the issue before requiring the employer to arbitrate. Upon further consideration, however, the district court reversed itself and found that the employer would suffer no more financial harm if required to arbitrate than it would if it went to court. The court also found that the negative perceptions of the employer's customers, creditors and competitors concerning the employer's financial stability would be the same whether the withdrawal obligations were decided in an arbitral or a judicial forum. *See id.* at 15–16. This reasoning was upheld by the Third Circuit, 830 F.2d 1241, 1246 (1987).

More important to the analysis, however, are the specific circumstances that surround withdrawal liability disputes. The MPPAA was passed to protect the financial stability of the plans, along with the remaining contributing employers. The longer the employer evades its obligation, the graver the injury to a plan and the greater the unfairness to the remaining employers. Financial harm always will attend both a plan sponsor and the employer by virtue of the costs and delay of disputing and/or paying the assessment. Thus, the irreparable injury exception is inapplicable, because to allow the costs of disputing the liability to be offered as an excuse to avoid the mechanism Congress set up to effectuate collection in the first place would be to subvert entirely the purpose of the MPPAA.

Furthermore, as the Fourth Circuit has stated:

> Confronted with the choice of who should bear the economic burden of unfunded pension liability left by withdrawing employers, Congress did not in our view act inequitably in requiring that employers who received the full benefit of their employees' services should bear the cost rather than the employees who provided their services on the actual or implied promise that they would ultimately enjoy their vested, accrued pension benefits.

*Republic Indus., Inc. v. Teamsters Joint Council,* 718 F.2d 628, 639 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

### The Futility Exception

The remaining exception, for "futility," also is inappropriate under the MPPAA. Futility exceptions contemplate that, under certain circumstances, an agency cannot or will not afford a party adequate redress. The typical circumstances under which a party has been allowed to circumvent agency procedures are ones that show inherent bias on the part of the agency or where the agency has demonstrated by past actions, be it past patterns of decision making, the agency's past position on the merits of the case at issue, or agency statements, that it will not grant the relief sought by the party seeking relief in court. *See* 4 K. Davis, *Administrative Law Treatise* § 26:3, at 421–25 (2d ed.1983); *see also* Gelpe, *Exhaustion of Administrative Remedies: Lessons from Environmental Cases,* 53 Geo.Wash.L. Rev. 1, 38 n. 128 & 40–41 (1984–85). The

rationale for this exception, however, only is relevant within the context of a single administrative body that generates policy, as well as settles disputes, and that is also a party to the dispute at issue. Because the parties under the MPPAA jointly choose private, impartial arbitrators, these concerns are inapt. Additionally, should any indication of bias be shown, either party may request that an arbitrator withdraw at any point in the proceedings before the final award is rendered. *See* 29 C.F.R. § 2641.3(c).

Other situations that have been labelled "futile" are where the administrative agency is not empowered to grant the relief requested because of its lack of authority, *see* 4 K. Davis, *supra*, 26:4, at 425–31, or where the agency remedy is inadequate, *see* 4 K. Davis, *supra*, 26:11, at 464–68. Here again, the reasons for these exceptions go to an agency's competence to resolve the dispute. These are inapt under the MPPAA because Congress has vested arbitrators with the authority to decide withdrawal liability issues and the majority of the circuits have agreed that the arbitral provisions comport with due process. *See, e.g., Republic Indus., Inc. v. Teamsters Joint Council,* 718 F.2d 628, 639–41 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984) (delegation of adjudicatory authority to impartial arbitrator assures due process under MPPAA arbitral provisions); *Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, Inc.,* 762 F.2d 1137 (1st Cir.1985); *Washington*

*Star Co. v. Int'l Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1511 (D.C.Cir.1984); *Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396, 1403–04 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985).[12]

Given the importance of expediency to the effectiveness of the MPPAA, this Court concludes that Congress did not intend to leave the implementation of the mechanism designed to further that purpose—arbitration within the statutory grace period—to the vagaries of a doctrine that has been called by one MPPAA court "one of the most unsettled areas of the law." *See Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund,* 537 F.Supp. 1036, 1037 (E.D.Pa.1982) (quoting *Bethlehem Steel Corp. v. Environmental Protection Agency,* 669 F.2d 903, 907 n. 1 (3d Cir.1982); *cf. PPG Indus. Pension Plan A v. Crews,* 902 F.2d 1148, 1151 (4th Cir.1990) ("ERISA was designed to ensure that substantive pension benefits not be subject to the vagaries of state law."). Likewise, administrative law scholar Kenneth Davis has found that "although the courts often quote from *Meyers v. Bethlehem Steel Shipbuilding Corp.,* 303 U.S. 41, 50–51, [58 S.Ct. 459, 463–64, 82 L.Ed. 638] (1983), 'the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted,' the quoted words are false almost as often as they are

---

**12.** In *United Retail & Wholesale Employees Teamsters Union v. Yahn & McDonnell,* 787 F.2d 128 (3d Cir.1986), *aff'd* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987), the Third Circuit concluded that the statutory presumption of correctness afforded a plan sponsor's calculation of withdrawal liability in arbitration, *see* § 1401(a)(3)(A) & (B), violated an employer's right to due process. *Id.* at 137–42. This decision was based on the court's finding that the MPPAA allowed plan sponsors an impermissible amount of discretion in calculating withdrawal liability, rather than on any structural infirmity in the arbitral process. In fact, the court stressed that a *de novo* review in arbitration of the liability would offer employers a constitutionally sound decision making process.

Along with the other circuits that have upheld the presumption, the Fourth Circuit has rejected

the argument that plan trustees have an inherent bias in making overly liberal liability assessments, based on the fact that the boards of trustees are chosen by both the participating employers and the unions, each with an equal number of representatives, that the trustees have a limited amount of discretion and that, as fiduciaries, they are required to act as such. *See Republic Indus.,* 718 F.2d at 640 & n. 13; *see also Trucking Employees of New Jersey,* 560 F.Supp. at 303 (Trustees have duty to investigate the factual circumstances of withdrawal before asserting liability based on "the long-established requirement that pension funds act independently of the interests of both management and labor." (citing 29 U.S.C. § 186)).

true." 4 K. Davis, *supra,* § 26:1, at 414. Indeed, the state of the law concerning the utilization of arbitration bears this out.

The next question is whether Congress constitutionally can require parties to arbitrate first before resort to court.

 Multiemployer plans are products of a collective bargaining process that involves voluntary negotiations to contract. Whether or not certain provisions of the collective bargaining agreements are subject to arbitration depends upon the intention of the parties, supplemented by national labor policy. *See Teamsters Pension Trust Fund v. Allyn Transp. Co.,* 832 F.2d 502, 505 (9th Cir.1987). Like other statutes that embody national labor policy, the MPPAA is a hybrid between a voluntary agreement between the parties to arbitrate and a typical administrative provision mandating that certain procedures be followed in order to receive certain benefits or relief. *See I.A.M. Nat'l Pension Fund, Plan A Benefits v. Clinton Engines Corp.,* 825 F.2d 415, 417 n. 4 (D.C.Cir.1987). That is, in the case of withdrawal liability, the duty to arbitrate arises not from an express agreement between the parties, but from the MPPAA itself. *Id.*[13]

Because Congress has not withdrawn from Article III courts jurisdiction over this class of disputes, but rather, has mandated that the parties first undertake to resolve their dispute through arbitration, the statutory scheme "governs only the question whether court or agency will initially decide a particular issue, not the question whether court or agency will *finally* decide the issue." 3 K. Davis, *Administrative Law Treatise* § 19.01, p. 3 (1958) (emphasis in original). "Court jurisdiction is not thereby ousted, but only postponed." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963).

Under other comprehensive labor statutes, the Supreme Court has required parties first to submit their dispute to arbitration,[14] *see, e.g., Andrews v. Louisville & Nashville R.R. Co.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972) (Railway Labor Act); *Garner v. Teamsters, Chauffeurs and Helpers Local,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953) (Labor–Management Relations Act), while recognizing that the duty to arbitrate arises "not from any contractual undertaking between the parties but from the Act itself." *Andrews,* 406 U.S. at 323, 92 S.Ct. at 1565 (Railway Labor Act); *cf. General American Tank Can Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940) (parties required to submit to arbitration under the Interstate Commerce Act).

Similarly, under the MPPAA, the Fourth Circuit has recognized that "Congress may require arbitration so long as fair procedures are provided and ultimate judicial review is available." *Republic Indus.,* 718 F.2d at 640. And, indeed, in *Republic* the court concluded that MPPAA's arbitral provision did comport with due process of law. *Id.* at 640–41.

Additionally, the fact that it is a "particularized area of law" that is to be arbitrated and that the arbitrator's decision can be vacated or modified by a district court support the conclusion that the jurisdictional requirements are constitutional. *See Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 852–53, 106 S.Ct. 3245, 3257–58, 92 L.Ed.2d 675 (1986).

 Thus, this Court holds that the defendants could not circumvent the arbitral requirement by resorting themselves or forcing plaintiffs to resort to a federal court, bankruptcy or otherwise, and have, therefore, waived their ability to dispute the amount of the assessment.[15]

---

13. On the other hand, by virtue of the contract to establish a pension plan, an employer is afforded the protection of the PBGC, as well as tax advantages. *See Pension Benefit Guar. Corp. v. Ouimet Corp.,* 630 F.2d 4, 9 (1st Cir.1980).

14. The Court hesitates to use the term "primary jurisdiction" because, like the exhaustion doctrine, the rationale underlying primary jurisdiction does not translate to the underlying purpose of the arbitral provisions of § 1401.

15. Additionally, it is now clearer than ever that "the devastating impact overcrowded dockets have on the quality of justice received by all litigants makes it essential that courts be re-

■ And because the requirement is jurisdictional, it must be strictly construed and will not be tolled. *Hardin v. City Title & Escrow Co.,* 797 F.2d 1037, 1038 (D.C.Cir.1986).

Although this Court recognizes the severity of the result to the Defendants, it also finds appropriate to this case the court's conclusion in *Barker & Williamson.* There the members of a commonly controlled group failed to come forward and request arbitration after an affiliate had incurred withdrawal liability and had been notified *via* notice and demand. The court found that where an employer does not request review and arbitration over the liability of an affiliate "it gambles that it will not later be found to be a member of a controlled group with the withdrawn employer. It also risks losing the possibility of review and arbitration and risks default.... When a corporation chooses this ... course the result, though seemingly harsh, is but a self inflicted wound." *Id.* at 129.

### Joint and Several Liability under the MPPAA

■ Even if the doctrine of exhaustion did apply, the Defendants first must establish that what is a valid exception for one affiliate of a commonly controlled group is valid for the rest of the affiliates. Defendants argue that since the MPPAA treats members under common control as a "single employer" for purposes of notice and liability, a valid "defense" by one member inures to the benefit of all the members. In other words, they contend, "a defense by one is a defense by all." Consequently, they assert, the resolution of the liability of a withdrawing employer in the context of a bankruptcy proceeding resolves the liability of the nonbankrupt controlled group members. Therefore, Defendants argue, the MPPAA does not require each affiliate of a controlled group to contest liability independently and that a decision concerning the liability of the bankrupt member of the

served for the resolution of disputes for which no other adequate forum is available." *Moore v. East Cleveland,* 431 U.S. 494, 523, 97 S.Ct.

controlled group would be *res judicata* against the remaining affiliates. This argument seems to be the basis for their assertion that they were all discharged of liability when the bankruptcy court confirmed M & D's Plan of Reorganization.

At the same time, however, Defendants point to the expansive jurisdictional scope of the bankruptcy courts regarding "non-core" proceedings, contending that the liability of the defendants was within the subject matter jurisdiction of the bankruptcy court as a case "related to" the bankruptcy case of M & D and properly could have been disposed of there. Analogizing themselves to guarantors because "29 U.S.C. § 1301(b)(1) forces controlled group members to be statutory guarantors of the debtor's liability," Defendants Reply Brief at 11, Defendants cite cases holding that the liability of a guarantor of a debtor can be adjudicated by a bankruptcy court. *See* Defendants' Opposition to Summary Judgment at 5.

Defendants simultaneously claim that jurisdiction over the Defendants is not necessary if they are guarantors, because a bankruptcy court judgment against a debtor binds the guarantor.

To accept Defendants' arguments would be to turn the concept of a commonly controlled group and attendant joint and several liability on its head and allow it to be used as a shield against liability rather than a tool with which pension plan sponsors may recover withdrawal liability due and owing a plan.

■ Defendants' interpretation of the concept of joint and several liability is situated within the context of the factual circumstances historically surrounding its imposition; that is, where more than one tortfeasor is responsible for a plaintiff's injury, but where responsibility is not easily apportioned or where the tortfeasors jointly conspired to injure the plaintiff. *See McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984); *see also Edmonds v. Compagnie Generale Transatlantique,* 443

1932, 1948, 52 L.Ed.2d 531 (Burger, J., dissenting).

U.S. 256, 260, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1978).

In such cases, it is deemed more equitable to allow the injured party to recover all of the damages from one party and let the defendants figure out their proportionate responsibility than to require the plaintiff to bear the burden of proving proportionate fault or risk partial compensation where one defendant was, for whatever reason, unable to pay its portion of the damages. *See Jenkins by Agyei v. Missouri,* 855 F.2d 1295, 1318 (8th Cir.1988), *rev'd on other grounds,* —— U.S. ——, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (Lay, J., concurring & dissenting) (clear that "under a judgment of joint and general liability that upon failure of one tortfeasor to comply with the judgment because of financial inability ... any other tortfeasor may be liable for the whole."). In these circumstances the multiple tortfeasors are, in fact, separate persons, suable separately or jointly, at the plaintiff's option. *See In re Northeast Dairy Coop. Fed'n, Inc.,* 88 B.R. 21, 23 (Bankr.N.D.N.Y.1988) (construing joint and several liability in bankruptcy context).

The application of joint and several liability to commonly controlled corporations, however, necessitates a conceptual reworking to allow for the realities of corporate structuring. Whereas under the usual circumstances there are actually separate defendants, each with one pocket, the controlled group concept is best analogized to one defendant with many different pockets. Once found liable as a "single employer," the corporate defendant cannot evade judgment by shifting its assets to its back pockets while pleading inability to pay because of its empty front pockets.

Consequently, under this analysis, M & D's insolvency has no bearing on the liability of the affiliated Defendants nor on their ability to pay the withdrawal assessment.

Defendants offer, as a basis for their argument that a bankruptcy court can resolve withdrawal liability three bankruptcy cases that ruled on the issue of the resolution of the withdrawal liability of the *bankrupt* employer. But the defendants' reliance on *In re T.D.M.A., Inc.,* 66 B.R. 992 (Bankr.E.D.Pa.1986), *In re Amalgamated Food, Inc.,* 41 B.R. 616 (Bankr.C.D.Cal. 1984) and *In re Cott Corp.,* 26 B.R. 332 (Bankr.D.Conn.1982) is misplaced for the simple, but dispositive, reason that in none of those cases was the liability of *nonbankrupt* members of a controlled group at issue.

The courts that *have* decided this issue, however, support the Fund's, rather than the defendants', position. Most recently, in *I.A.M. Nat'l Pension Fund v. Slyman Indus.,* 901 F.2d 127 (D.C.Cir.1990), decided during the pendency of this motion, the Court of Appeals for the District of Columbia rejected an argument similar to that of the defendants' where solvent members of a commonly controlled group attempted to use the bankruptcy proceedings of a withdrawing member to excuse them from the MPPAA arbitration requirements. There, the pension fund sent a notice and demand letter and filed a proof of claim shortly after the withdrawing employer filed for relief under Chapter 11. The pension then sued two solvent members of the controlled group in district court in an attempt to collect the withdrawal liability assessment. *See I.A.M. Nat'l Pension Fund v. Slyman Indus.,* 1988 WL 60342 (D.D.C. May 31, 1988). At the time of the collection action neither the solvent members nor the debtor member of the group had made any scheduled payments or requested a review or arbitration of the assessment.

As a threshold determination, the district court found that the letter to the debtor served as constructive notice to the debtor's affiliates pursuant to § 1301(b), and that, having been notified, the solvent members were jointly and severally liable for the assessment. The court then concluded that the bankruptcy of the withdrawing member was irrelevant to the failure of the nonbankrupt affiliate members to initiate arbitration, and therefore granted summary judgment for the pension fund, holding that the amount of withdrawal liability demanded by the Fund was due and owing.

On appeal, the nonbankrupt affiliates argued that the rule of constructive notice ought not in equity apply where the withdrawing employer was in bankruptcy and the affiliated members "reasonably" believed that the demand must be processed through the bankruptcy court. Therefore, they argued, the 90 day grace period must be equitably tolled during the pendency of the bankruptcy proceedings, and that they had the 90 days in which to request arbitration.

The Court of Appeals rejected this argument, concluding that the joint and several liability of a commonly controlled group of corporations precludes this argument, and that, whatever the protection implicated by the bankruptcy proceedings, they did not affect the liability of a nonbankrupt affiliate "any more than one joint tortfeasor would be protected because another is in bankruptcy proceedings." *Slyman*, 901 F.2d at 129. It then affirmed the district court's grant of summary judgment against the affiliates for the entire amount of the Fund's assessment.

Other courts have agreed with this analysis. In *Connors v. Calvert Development Co.*, 622 F.Supp. 877 (D.D.C.1985), the district court granted summary judgment for the pension fund, holding solvent members of a commonly controlled group that did not request arbitration or make interim payments jointly and severally liable for the withdrawal liability assessment against a withdrawing bankrupt affiliate, notwithstanding their argument that they were entitled to separate letters of notice and demand. *Id.* at 882. The court reasoned that § 1301(b)(1) was enacted "to prevent such evasion of ERISA through the abuse of the structural formalities of overlapping business organizations." *Id.*

Likewise, in *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Salt Creek Terminals, Inc.*, 1986 WL 21503 (W.D.Wash. Feb. 6, 1986), the district court granted the pension fund's summary judgment motion and as-

sessed withdrawal liability against nonbankrupt members of a commonly controlled group for the withdrawal liability of the bankrupt affiliate because they had failed to come forward to request review and arbitration within the statutory grace period. The court refused to let the employers raise any dispute concerning the merits of the assessment in court, specifically the labor dispute exemption, because the issue had not first been arbitrated. *Accord Board of Western Conference of Teamsters Pension Trust Fund v. D & J Investment Co.*, No. C 83–1137D (W.D. Wash. May 3, 1985) (nonbankrupt affiliated employers jointly and severally liable for withdrawal liability of withdrawing bankrupt employer because failed to request review within 90 day limit). *See also Mason & Dixon Tank Lines v. Central States, Southeast and Southwest Areas Pension Fund*, 852 F.2d 156, 163 (6th Cir. 1988) (citing lower court that found that "[w]hile the MPPAA can treat the two corporate entities as one for the calculation and assessment of liability, they are not a single employer for purposes of bankruptcy law and [the nonbankrupt affiliate] was not a co-debtor with [the bankrupt] in its bankruptcy proceedings.").

Thus, even if the withdrawal liability of M & D could be resolved in bankruptcy proceedings, it would be irrelevant to the liability of the nonbankrupt defendants.

### *Equitable Tolling under the MPPAA*

■ Lastly, the defendants argue that even if this Court finds that M & D's bankruptcy proceedings were not a viable forum in which to contest their liability, the 90 day time limit for arbitration should be equitably tolled so they can contest the assessment now.[16]

As aptly pointed out by the Fund and the PBGC, however, an analysis of the application of the doctrine of equitable tolling reveals that it undermines the Congressional purpose of the statute and is, therefore, unavailable under the MPPAA.

---

16. Of course, under the Court's original analysis, equitable tolling would not be available due to the fact that the arbitral requirements are

jurisdictional. *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038 (D.C.Cir.1986).

Although the doctrine of equitable tolling, like all principles of equity, cannot easily be reduced to a simple formula, the Supreme Court has laid down specific considerations that a court must weigh when deciding whether its imposition is appropriate. The bottom line inquiry in all cases is "whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances. In order to determine Congressional intent, [a court] must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." *Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 427, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1964). And, although generally equitable tolling principles are to be read into every federal statute of limitations, *see Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), "equitable tolling is a matter of congressional prerogative and can be read in only in the absence of congressional intent to the contrary," *Cook v. Deltona Corp.*, 753 F.2d 1552, 1562 (11th Cir.1985). *See Maressa v. A.H. Robins Co.*, 839 F.2d 220, 221 (4th Cir.1988) (Congressional intent precluded application of general equitable principles of tolling to time limits for filing proof of claim in bankruptcy); *Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516, 521 (10th Cir.1988) (doctrine implied only where application consistent with Congressional intent). *See also e.g., Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); *Bowen v. New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959); *Johnson v. Burnley*, 887 F.2d 471, 476 (4th Cir.1989).

"The MPPAA was designed (1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) . . . to ensure benefit security to plan participant." *Barker & Williamson*, 788 F.2d at 127 (original ellipses) (quoting H.R.Rep. No. 869, 96th Cong., 2d Sess. 71 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin. News 2918, 2939. *See Anderson v. Raine*, 907 F.2d 1476, 1479 (4th Cir.1990) ("The overriding purpose of ERISA is to guarantee the security of employees' retirement income."). The expeditiousness of the procedures to collect outstanding debts to the plan effectuates this protection. Thus, the purpose behind the grace period must be analyzed within the broader context of the Congressional goal of ensuring plan stability. Traditional equitable tolling jurisprudence does not mechanically translate to the scheme of the MPPAA, however, because tolling doctrine usually is applied in the context of remedial statutes where the beneficiary of the statute seeks to collect a benefit or assert a claim past the time allotted in the statute. The Supreme Court noted that in cases of this nature the "policy of repose . . . is frequently outweighed . . . where the interests of justice require vindication of the plaintiff's rights." *Burnett*, 380 U.S. at 428, 85 S.Ct. at 1055.

This analysis is inappropriate in the context of the scheme of the MPPAA, however. This is because, as the Supreme Court pointed out in *Burnett*, "statutes of limitations are primarily designed to assure fairness to the *defendants*," *id.* at 428, 85 S.Ct. at 1054 (emphasis added), because "the right to be free of stale claims in time comes to prevail over the right to prosecute them," *id.*, (citing *Order of R. R. Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)). Under the MPPAA, however, the grace period was inserted to protect the *plaintiffs*, not the defendants. That is, the 90 day period in which an employer has to request review and arbitration serves as an assurance that a dispute concerning the withdrawal liability assessment would proceed to a forum that can be quickly utilized and that is especially equipped to deal with the intricacies of the MPPAA. Furthermore, to allow the party that has the incentive *not* to comply with the time limits effectively to control whether or not they are utilized would eviscerate the effectiveness of the MPPAA completely.

The Court is also mindful that the Supreme Court has declared that:

procedural requirements established by Congress for gaining access to the Federal Courts are not to be disregarded by courts out of a vague sympathy for particular litigants. As we stated in *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980), "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guaranty of even handed administration of the law."

*Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984).

This Court agrees that (to paraphrase a recent statement by the Fourth Circuit in an employment discrimination case): Over time, strict judicial adherence to the time limit provision may benefit employers because they will be encouraged to request review and arbitration in a timely manner, rather than to rely on the application of uncertain exceptions which may be unevenly or arbitrarily administered. *See Olin v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir.1990).

■■■ Even if equitable tolling were applicable generally, equity certainly does not compel its application in the circumstances of this case.

In support of their argument Defendants cite other MPPAA cases in which either a plan sponsor or a withdrawing employer filed an action in federal court to resolve issues concerning withdrawal liability and the courts tolled the 90 day grace period and remanded the action to arbitration. With the exception of *Chicago Truck Drivers*, however, the cases cited by the Defendants are inapposite in one very important respect. In all of the cases cited, the parties argued and the court found that the action belonged in federal court in the first instance because there was a strong argument that the case fell within an exception to the administrative exhaustion doctrine— an argument not present here.[17] *See, e.g.,*

*Robbins v. Pepsi–Cola Metro. Bottling Co.*, 636 F.Supp. at 679 n. 53 (legal issues); *Flying Tiger Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 659 F.Supp. at 16 (irreparable injury); *Banner Indus. v. Central States, Southeast and Southwest Areas Pension Fund*, 657 F.Supp. 875, 882 (N.D.Ill.1987).

Defendants particularly rely on *Trustees of the Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Central Transport, Inc.*, 888 F.2d 1161 (7th Cir.1989), a case in which Central Transport, GLS Leasco, Inc., and Centra, Inc., resisted a collection action under basically the same circumstances present here. The Seventh Circuit held that the grace period to request review was equitably tolled where a plan sponsor filed a proof of claim in M & D's bankruptcy proceeding and two of its affiliates filed objections.

Although there seemed to be no finding of circumstances which would indicate that the policies underlying the exhaustion of administrative remedies would not be implicated and although the court explicitly refused to rule on the appropriateness of this alternate forum, it tolled the time limit because of the defendants' "reasonable belief" that the issue of withdrawal liability could be addressed by the bankruptcy court. *Id.* at 1165. The court cited the three bankruptcy cases cited by the defendants here as the basis for the defendants' "reasonable belief" that their withdrawal liability could be adjudicated in the bankruptcy proceedings, *i.e.*, *In re T.D.M.A., Inc.*, 66 B.R. 992 (Bankr.E.D.Pa.1986), *In re Amalgamated Foods Inc.*, 41 B.R. 616 (Bankr.C.D.Cal.1984) and *In re Cott Corp.*, 26 B.R. 332 (Bankr.D.Conn.1982).

For the reasons stated above, however, this Court does not find these cases to be relevant to the issue of liability of affiliate members of the bankrupt's commonly controlled group, and, therefore, declines to follow the lead of the Seventh Circuit in allowing a party to bypass express statu-

---

17. Although the Defendants now raise the statutory exception, it is clear to the Court that this could not have been the Defendants' reason for failing to request arbitration initially, for the simple reason that the fact upon which their argument is based, M & D's reorganization confirmation, had not yet occurred.

tory requirements based on what a party may self-servingly label their "reasonable belief."

Furthermore, it has been five years since the Defendants withdrew from the pension plan, and it is clear that they have done everything possible to avoid their contractual obligation. They have neither paid the scheduled monthly payments due the plan nor had they ever requested arbitration until this suit was filed. It is a well settled maxim of equity that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse the lack of diligence." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir.1987) (quoting *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). Moreover, the factual circumstances surrounding the misleading of the Fund as to their affiliate status, as well as their rather sophistic arguments to this Court, lead this Court to find that the defendants shall find no refuge in equity, nor shall they evade their obligations any longer.

Thus, this Court concludes that "[t]o countenance short-circuiting of the [arbitral] proceedings here would be, under all circumstances but more especially in view of Congress' policy and command with respect to those proceedings, a long over-reaching of equity's strong arm." *Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 781, 67 S.Ct. 1493, 1507, 91 L.Ed. 1796 (1947).

### *Relief*

■ 29 U.S.C. § 1132(g)(2) states that:

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A).

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

The language of this section is mandatory and not within the discretion of the court. *See Yahn & McDonnell*, 787 F.2d at 134; *Operating Engineers Pension Trust v. Reed*, 726 F.2d 513, 514 (9th Cir.1984); *Carpenters Amended and Restated Health Benefit Fund v. John W. Ryan Constr. Co.*, 767 F.2d 1170 (5th Cir.1985); *see also Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 265 (2d Cir.1990).

### *Interim Payments*

Even if Defendants were allowed to arbitrate the merits of the assessment, the Fund claims that the entire amount is due and owing now because Defendants failed to make any interim payments as scheduled in the notice and demand letter of January 11, 1985, and as required by the MPPAA.

29 U.S.C. § 1399(c)(2) provides:

Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand *notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.*

(emphasis added).

29 U.S.C. § 1401(d) provides:

Payments shall be made by an employer in accordance with the determination made under this part *until the arbitrator issues a final decision* with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for over-

payments or underpayments arising out of the decision of the arbitrator with respect to the determination. (emphasis added).

 All of the circuits that have decided the issue of interim payments have agreed that Congress intended that the withdrawing employers "pay first and dispute later." *See Marvin Hayes Lines*, 814 F.2d 297, 301 (6th Cir.1987). Therefore, pursuant to the statutory directive, employers have been compelled to make interim payments during the review and arbitration procedures. *See, e.g., Debreceni v. Merchants Terminal Corp.*, 889 F.2d 1 (1st Cir.1989); *Trustees of Retirement Fund of the Fur Manuf. Indus. v. Lazer–Wisotzky, Inc.*, 738 F.2d 419 (2d Cir.1984); *Robbins v. Pepsi–Cola Metro. Bottling Co.*, 800 F.2d 641, 677–78 (7th Cir.1986); *Trustees of the Amalgamated Insur. Fund v. Geltman Indus., Inc.*, 784 F.2d 926 (9th Cir.1986). Likewise, an employer must continue interim payments pending a judicial determination. *See Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 297–98 (3d Cir.1982).

Defendants, therefore, must pay all overdue scheduled payments, along with interest, liquidated damages, costs and attorneys fees.

A separate judgment order so providing will be entered.

### JUDGMENT ORDER

For the reasons stated in a Memorandum Opinion entered of even date herewith, it is by the Court this 28th day of August 1990, ORDERED:

1. That the Motion for Summary Judgment of Plaintiffs BE, and it hereby IS, GRANTED;

2. That the Motion to Dismiss of Defendants BE, and it hereby IS, DENIED;

3. That Judgment BE, and it hereby IS, ENTERED for Plaintiffs for withdrawal liability, in the amount of $401,960.00, with interest from February 1, 1988 to the date hereof at the rate permitted by the PBGC (or the Trust Agreement), and at the general statutory rate thereafter, liquidated damages in the amount of the greater of the interest calculated hereunder or $80,-392.00, attorneys' fees and costs;

4. That Plaintiffs BE, and they hereby ARE, GRANTED leave to file their motions pursuant to Local Rule 109, D.Md., within 30 days of the date of this Judgment.