983 F.2d 495
 16 Employee Benefits Cas. 1222
 BOARD of TRUSTEES of TRUCKING EMPLOYEES of NORTH JERSEY
WELFARE FUND, INC.--PENSION FUND
v.
CENTRA, a Delaware Corporation; General Highway Express, an
Ohio Corporation; Central Transport, a Michigan
Corporation; GLS Leasco, a Michigan Corporation; Central
Cartage Co., a Michigan Corporation; C.T. Transport, Inc.;
Port Side Transport, Inc.; McKinlay Transport, Ltd.; Crown
Enterprises; Bancroft Trucking Co.
Centra Inc; General Highway Express, Inc.; Central
Transport, Inc.; GLS Leasco, Inc.; Central Cartage Co.;
C.T. Transport, Inc., Port Side Transport, Inc.; McKinlay
Transport, Ltd.; Crown Enterprises; and Bancroft Trucking
Co., Appellants.
 Nos. 92-5140, 92-5116 and No. 91-5959.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 22, 1992.
Decided Dec. 29, 1992.
 
 Craig L. John, Mary E. Royce (argued), Joseph H. Hickey, Bloomfield Hills, MI, Patrick A. Moran, William G. Shanaberger, Patrick Moran & Associates, Southfield, MI, for appellants.
 Elizabeth Roberto (argued), Eames, Wilcox, Mastej, Bryant, Swift & Riddell, Detroit, MI, James R. Zazzali, Zazzali, Zazzali, Fagella & Nowak, Newark, NJ, for appellee.
 Before: COWEN, NYGAARD and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 I. INTRODUCTION
 
 1
 The Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.--Pension Fund ("the Fund") filed this suit pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 et seq. (amending provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.), seeking to collect withdrawal liability from Centra, Inc. and several of its subsidiaries (collectively "Centra"). Centra's potential liability to the Fund arose from Centra's acquisition of Mason and Dixon Lines, Inc. ("Mason-Dixon"), a contributor to the Fund that later filed for bankruptcy and permanently withdrew from the Fund. Mason-Dixon and the Fund previously had signed a settlement agreement, approved by the bankruptcy court, under which the Fund received Mason-Dixon preferred stock in exchange for releasing Mason-Dixon and its successors from any further liability. Centra defended the collection action by arguing that it did not control Mason-Dixon at the time Mason-Dixon withdrew from the Fund and that the broad release clause in the settlement agreement immunized Centra from liability.
 
 
 2
 Subsequently, the Fund filed a motion with the bankruptcy court, seeking to vacate the order approving the settlement agreement on the grounds of misrepresentation, mistake and breach of the settlement agreement. The bankruptcy court refused to vacate its prior order and made findings that neither misrepresentations nor justifiable mistake induced the Fund to sign the agreement. The district court then entertained a summary judgment motion by the Fund on the issue of interim payments. The district court found that Centra controlled Mason-Dixon and ordered Centra to make interim payments to the Pension Fund pending final resolution, by an arbitrator, of the dispute concerning the enforceability of the settlement agreement. Centra appeals this ruling.
 
 
 3
 Because, on the date of Mason-Dixon's withdrawal from the Fund, Centra possessed the same degree of control over Mason-Dixon that an option contract confers, we agree with the district court that Centra was in common control with Mason-Dixon. Although the bankruptcy court reserved the ultimate issue of the propriety of the Fund's rescission of the settlement agreement, its specific findings that neither mistake nor misrepresentation caused the Fund to sign the settlement agreement bar relitigation of these issues. The remaining issue, whether the Fund could rescind the settlement agreement due to Mason-Dixon's breach, must be decided on remand in the district court because this issue does not fall within the exhaustive list of arbitrable issues outlined in MPPAA. Finally, MPPAA's "pay first, dispute later" policy requires Centra to make interim payments to the Fund pending final resolution of the dispute. Therefore, we will affirm in part and reverse in part the district court's ruling, and will remand for trial on the issue whether Mason-Dixon breached the settlement agreement, and if it did, whether the breach was sufficiently substantial to justify the Fund's rescission of the agreement.
 
 II. PROCEDURAL AND FACTUAL BACKGROUND
 
 4
 The Pension Fund, a plan sponsor of a multiemployer fund as defined by 29 U.S.C. § 1301(a)(3) (1988), filed this action against Centra to collect withdrawal liability pursuant to MPPAA. Under MPPAA, when a contributing employer withdraws from participation in a fund, the employer is responsible for his pro rata share of the unfunded vested liability remaining in the fund at the time of withdrawal, subject to certain adjustments. See 29 U.S.C. § 1381(b) (1988). The Act provides a series of complicated formulas by which the amount of liability is to be calculated. See 29 U.S.C. § 1391 (1988 & Supp. I 1989). Not only contributing employers, but also any businesses "under common control" with that employer are liable to a fund when an employer withdraws. See 29 U.S.C. § 1301(b)(1).[1] Under a common control theory, the Fund sought collection from Centra of the allegedly unpaid withdrawal liability assessments of Mason-Dixon, a company acquired by Centra that later entered bankruptcy and permanently withdrew from the Fund.
 
 
 5
 Mason-Dixon, a trucking company, signed a collective bargaining agreement with its union, which obligated Mason-Dixon to contribute to the Pension Fund on behalf of its union employees. Mason-Dixon made regular payments to the Fund for several years. On March 29, 1984, because of severe financial difficulties, Mason-Dixon filed a Chapter 11 petition for reorganization in a North Carolina bankruptcy court. Mason-Dixon discontinued contributions to the Fund on April 9, 1984.[2] The Fund admits that it learned of the Mason-Dixon bankruptcy during the summer of 1984. Nevertheless, on July 10, 1985, a year after they initially became aware of the bankruptcy proceeding, the Fund sent a statutory Notice and Demand to Mason-Dixon, claiming $778,616 in withdrawal liability and demanding payment. Although MPPAA allows an employer sixty days to arbitrate any dispute concerning a determination under specified MPPAA sections or to challenge other aspects of the withdrawal liability assessment in court, see 29 U.S.C. § 1401(a)(1) (1988), Mason-Dixon never responded to the Notice and Demand letter.
 
 
 6
 At the same time it sent the Notice and Demand letter, the Fund also filed a proof of claim for withdrawal liability with the North Carolina bankruptcy court overseeing Mason-Dixon's reorganization. The proof of claim was filed long after the deadline set by the bankruptcy court. Eight months after the filing of the proof of claim, Mason-Dixon objected to the Fund's claim on the grounds that it was untimely, and the Fund failed to respond to this procedural objection. Pursuant to an Order of Confirmation dated March 29, 1986, the bankruptcy court disallowed the Fund's claim due to its belated filing and discharged Mason-Dixon's debts.
 
 
 7
 In 1988, approximately two years after the Fund's claim was dismissed, the Fund filed a motion with the bankruptcy court requesting reconsideration of its untimely claim because the Fund's law firm, Zazzali, Zazzali & Kroll, never received any notice of the hearing to dismiss the Fund's claim as time-barred.[3] During the pendency of that motion, the Fund and Mason-Dixon successfully negotiated a settlement agreement. The Fund received $545,031, seventy percent of the face value of its claim, to be paid in Mason-Dixon preferred stock. The stock was worth very little since it was redeemable only after twenty years, paid no interest, and provided its owner with no voting rights. The agreement provided that Mason-Dixon would issue this stock within ten days of the date of settlement. The agreement also contained a broad release clause, releasing Mason-Dixon and all of its successors in interest from all claims, including withdrawal liability claims.[4] The parties signed the settlement agreement on December 28, 1989 and the bankruptcy court approved it on January 5, 1990.
 
 
 8
 On November 29, 1983, unbeknownst to the Fund, Centra had executed a stock-purchase agreement with the shareholders of Mason-Dixon. The agreement gave Centra the exclusive right to purchase all of the outstanding shares of Mason-Dixon, contingent upon approval from the Interstate Commerce Commission ("ICC") and several state regulatory agencies. On January 4, 1984, the ICC granted Centra temporary authority to operate Mason-Dixon, and the ICC finally approved the stock acquisition on March 7, 1984. Because several state agencies regulating intrastate commerce did not announce their approval until after the ICC[5], the stock purchase agreement was not finalized until February of 1985.
 
 
 9
 The Fund alleges that at the time it negotiated the settlement agreement with Mason-Dixon, it was unaware of the existence of Centra or any other solvent party that was a potential source of payment. Although the settlement agreement contained signature lines only for the Fund and Mason-Dixon, the accompanying bankruptcy court order was signed by these parties as well as a Centra attorney. The Fund claims that it was unaware that a Centra representative signed the agreement.
 
 
 10
 After the agreement was signed and incorporated into a judgment by the bankruptcy court, the Fund inadvertently discovered that Centra previously had acquired Mason-Dixon. If Centra was under "common control" with Mason-Dixon at the time of Mason-Dixon's withdrawal from the Fund and possessed no other valid defenses, Centra would be jointly and severally liable for the withdrawal liability of Mason-Dixon. See 29 U.S.C. § 1301(b)(1). The Fund, therefore, investigated the timing of the transaction.
 
 
 11
 To eliminate Centra's potential defense that the settlement agreement released them from liability[6], the Fund brought a motion in the bankruptcy court to vacate the January 5, 1990 order approving the settlement agreement. The Fund claimed that the agreement was induced by misrepresentations and mistakes of fact because the Fund did not know about Centra's acquisition of Mason-Dixon. The Fund also asserted that it could rescind the agreement because Mason-Dixon breached their contractual obligation to issue the stock by failing to deliver any stock certificates or other evidence of ownership to the Fund. Centra conceded that Mason-Dixon had not delivered stock certificates to the Fund, but contended that the stock was issued when Mason-Dixon entered a notation to that effect in its corporate records. In its defense, Centra also argued that rescission was not an available remedy even if Mason-Dixon had committed a technical breach of the agreement.
 
 
 12
 In an August 19, 1991 order, the bankruptcy court refused to vacate its prior order, but explicitly declined to reach the ultimate issue of whether the Fund could rescind the agreement. The bankruptcy court specifically found that neither Mason-Dixon nor its counsel made any misrepresentations.[7] The court further determined that the Fund could not assert mistake of fact as a basis to invalidate the contract because Centra's ownership of Mason-Dixon was a matter of public record in the bankruptcy proceeding and the information contained in the court record would be imputed to the parties.[8] The bankruptcy court did not address the breach issue.
 
 
 13
 Concurrently with the motion in bankruptcy court, the Fund sent a Notice and Demand letter and a Notice of Rescission of the Settlement Agreement to Centra, and filed this action to secure payment. Within the sixty-day period allowed by statute, see 29 U.S.C. § 1401(a)(1), Centra initiated arbitration proceedings to contest the assessment. On August 2, 1991, the Pension Fund filed an amended complaint seeking interim payments pending final resolution of the dispute through arbitration.
 
 
 14
 The Fund moved for summary judgment in the district court on its claim for interim payments, arguing that MPPAA obligates Centra to make interim payments to the Fund while the dispute is being arbitrated. In response to Centra's assertion that the settlement agreement with Mason-Dixon immunizes it from liability, the Fund reiterated the arguments it raised in the bankruptcy court--(1) the agreement is void due to misrepresentation and mistake of fact; and (2) Mason-Dixon breached the agreement by failing to "issue," i.e. physically deliver, the preferred stock certificates. Centra contested these issues and asserted the affirmative defense that it was not in common control with Mason-Dixon on the date of withdrawal. Centra also argued that the district court, not arbitration, was the proper forum to ultimately resolve whether the Fund could collect Mason-Dixon's withdrawal liability from Centra.
 
 
 15
 In an opinion dated October 17, 1991, the district court granted the Fund's motion for summary judgment. The district court found: (1) interim payments are mandatory; (2) Mason-Dixon was under Centra's control at the time of withdrawal; (3) the bankruptcy court's refusal to vacate its order approving the settlement does not bar any of the Fund's present claims; and (4) the Fund's claims are not time-barred. The district court sent the dispute concerning the validity of the settlement agreement to an arbitrator for resolution, although Centra argued that the district court should decide this issue. A judgment reflecting the district court's conclusions was entered on November 15, 1991. Centra appealed this ruling and filed a motion for remand to allow the district court to correct defects in its judgment. We granted this motion and the district court entered a revised judgment on February 26, 1992. In a separate order, the district court awarded attorney's fees in the amount of $41,833 to the Fund. Centra filed timely notices of appeal from the revised order and the award of legal fees. We consolidated these three appeals.
 
 III. DISCUSSION
 
 16
 The district court had jurisdiction under 29 U.S.C. § 1132 (1988, Supp. I 1989 & Supp. II 1990), and 29 U.S.C. § 1451 (1988), and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 (1988). When reviewing orders granting or denying summary judgment, our scope of review is plenary. Philadelphia & Reading Corp. v. United States, 944 F.2d 1063, 1070 (3d Cir.1991). We apply the same test as the district court: under Federal Rule of Civil Procedure 56(c), summary judgment should be granted if there is no genuine issue of material fact and the moving party has demonstrated that it is entitled to judgment as a matter of law. When deciding a motion for summary judgment, we view all facts and the reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. See Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir.1982).
 
 A. Control Group Status
 
 17
 Whether a corporation has acquired control of a contributing employer by the date the contributing company withdraws from a multiemployer pension fund is a legal question for a district court to decide. See Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1249-51 (3d Cir.1987); IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 129 (3d Cir.1986). We have distinguished this question from the question of whether a business, once a member of a control group, has relinquished its control prior to the withdrawal date. See Flying Tiger Line, 830 F.2d at 1249-51. The latter issue is for an arbitrator to decide. Id.
 
 
 18
 In this case, the dispute over control concerns whether Centra initially acquired control over Mason-Dixon by April 9, 1984, the date Mason-Dixon permanently withdrew from the Fund. The district court was the proper forum to decide this issue of control. The district court held that Centra controlled Mason-Dixon on the withdrawal date. We agree.[9]
 
 
 19
 Only employers may be liable for withdrawal payments.[10] ERISA defines an employer to include businesses under "common control" with the actual employer on the withdrawal date. 29 U.S.C. § 1301(b)(1).[11] It is undisputed that Centra was not the actual owner of Mason-Dixon until well after the withdrawal date. A company, however, can achieve control group status without possessing actual ownership.
 
 
 20
 Under ERISA, which incorporates sections of the Internal Revenue Code to define common control, see id., a corporation controls a company when it owns eighty percent of the total value of all outstanding shares, 26 U.S.C. § 1563(a)(1) (1988). A person is deemed to own shares that he has an option to purchase, id. § 1563(e)(1), and this constructive ownership of stock is included when calculating the ownership percentage of a parent company, id. § 1563(d)(1). Because ERISA does not define "option," we have developed federal common law to interpret this statutory term. See Barker & Williamson, 788 F.2d at 124. In Barker & Williamson, we borrowed from the wealth of traditional common law to the extent it was consistent with the underlying policies of ERISA and MPPAA. Congress was more concerned with the degree of control exercised over the corporation than with classifying particular agreements as options. Therefore, we held that if an agreement confers upon a business the same degree of control over stock shares that an option would provide, then that business fulfills the control requirement. Id.
 
 
 21
 An option contract exists when a promise (1) meets the requirements for contract formation; and (2) limits the promisor's power to revoke an offer. Id. (citing Restatement (Second) of Contracts § 25 (1981)). In Barker & Williamson, a potential buyer orally agreed to purchase shares of stock at a reasonable price from the seller. The seller reported to the board of the company that he had accepted an offer to purchase his shares and the company's officers recorded the transfer contingent upon receipt of the assignment. We found that a contract had been formed because the parties had manifested mutual assent to enter into a contractual agreement and the seller's promise to pay a reasonable, but unspecified, price for the shares adequately described the consideration to be exchanged. Id. The oral agreement also fulfilled the second requirement of an option, that the seller's power of revocation be limited. Although the parties could dispute the amount that constitutes a reasonable price, the seller was contractually bound to sell his shares if the purchaser tendered a reasonable price. Id. at 124-25.
 
 
 22
 In this case, it is undisputed that the detailed stock purchase agreement met the requirements for contract formation. Centra's principal argument with respect to control is that Mason-Dixon possessed unlimited power to repudiate the contract. The stock purchase agreement gave Centra the exclusive right to purchase Mason-Dixon, but operating approval from the ICC and state regulatory agencies was an explicit condition precedent to the stock sale. Centra received temporary and permanent authority from the ICC to operate Mason-Dixon before the date of withdrawal, but not all state agencies had conferred intrastate authority by that date. Centra argues that until all specified regulatory authorities approved the stock transfer, Centra was unable to consummate the transaction and Mason-Dixon was free to revoke the contract without penalty.
 
 
 23
 Initially, we note that the absence of state regulatory approval is not a legal barrier that could prevent Centra from purchasing Mason-Dixon. The Interstate Commerce Act, 49 U.S.C. § 11341(a) (1988), which neither party cited, provides that once the ICC approves a stock transfer, a new owner may operate the company without the approval of a state authority. "A carrier, corporation, or person participating in that [ICC] approved or exempted transaction is exempt ... from all other law, including State and municipal law, as necessary to let that person carry out the transaction...." Id. Thus it is clear that federal law preempts any state law that might purport to require state approval before the transfer of stock or interstate operating authority may occur. Although the states can control access to intrastate transportation, they may not block a stock acquisition approved by the ICC. See Leaseway Transp. Corp. v. Bushnell, 888 F.2d 1212, 1214 (7th Cir.1989) (ICC has exclusive authority to approve the acquisition of motor carriers). After the ICC approved the transaction, no legal obstacle precluded the stock transfer.
 
 
 24
 Even if state agency approvals were not a legal barrier to closing the deal, Centra argues that they were an explicit contingency in the contract that left each party with the power to revoke up until the time of the last approval. State intrastate operating authority, although unnecessary to complete the stock transfer, was important to Centra because a trucking company cannot move goods between two points within a state without this approval. Mason-Dixon's trucks carried freight intrastate as well as interstate.
 
 
 25
 Whether an option contract exists, however, depends only on if there are significant limitations on the seller's power to revoke. See Barker & Williamson, 788 F.2d at 124. Mason-Dixon had no power to revoke the stock purchase agreement on April 9, 1984. The condition that the state regulatory agencies grant intrastate operating authority was inserted solely for the benefit of Centra. Therefore, Centra could waive that condition and obligate Mason-Dixon to sell its shares even if some states withheld their approval. See Restatement (Second) of Contracts § 225(1) cmt. 6 (1981) (condition may be excused by subsequent promise to perform despite non-occurrence of the condition); 5 Williston on Contracts § 678 (3d ed. 1971) (condition may be excused by waiver). Mason-Dixon lost its power to revoke the stock purchase agreement when the ICC granted Centra permanent authority to operate Mason-Dixon and thus removed the final legal barrier to the consummation of the sale. Although Centra could elect not to proceed with the stock purchase if any state failed to grant intrastate operating authority, an option owner always has the power to allow an option to lapse for any reason. That discretion is the hallmark of an option. Mason-Dixon, the seller, however, could not rescind the contract after the ICC granted its permanent operating authority to Centra. On April 9, 1991, the date of withdrawal from the Fund, Centra exercised the same degree of control over Mason-Dixon that an option would confer and was under "common control" with Mason-Dixon.
 
 
 26
 Centra urges us to follow the anomalous holding of a Tennessee district court that a company may only be in a single control group at a given time. See Central Transport, 640 F.Supp. at 59-60. Centra asserts that since the King family directly controlled Mason-Dixon on April 9, 1991, they should constitute the sole control group against whom liability could be assessed. This reasoning defies the language of MPPAA and its underlying policies.
 
 
 27
 MPPAA states that all companies in common control with the withdrawing employer are jointly and severally liable. See 29 U.S.C. § 1301(b)(1); 26 U.S.C. § 412(c)(11)(B) (1988). Congress extended liability to all entities in common control with the actual withdrawing employer because the existing legislation prior to MPPAA "did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984); see also H.R.Rep. No. 96-869, 96th Cong., 2d Sess. 71 (1980), reprinted in 1980 U.S.C.C.A.N. 2918, 2939 (MPPAA was designed "(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) to encourage the growth and maintenance of multiemployer plans in order to ensure benefit security to plan participants"). If a company could only belong to a single control group, then actual owners always would be the sole controlling group. This would render meaningless MPPAA's provision extending liability to all entities exercising common control. Without a clear congressional command to the contrary, we will not construe a statute in a way that renders a provision superfluous. See United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955); United States v. Alcan Aluminum Corp., 964 F.2d 252, 265 (3d Cir.1992). We give effect, if possible, to every clause and word in a statute. Further, because MPPAA is a remedial statute, it should be construed liberally in favor of protecting the participants in employee benefit plans. Barker & Williamson, 788 F.2d at 127.
 
 
 28
 MPPAA extends liability to all companies in common control with the withdrawing employer. Therefore, more than one company simultaneously may actually or constructively control a given business. Having established as a threshold matter that Centra is an employer under MPPAA, we now turn to Centra's affirmative defenses.
 
 
 29
 B. Preclusionary Effects of Bankruptcy Proceedings
 
 1. Claim Preclusion
 
 30
 Centra first argues that the bankruptcy court's January 5, 1990 order, which incorporated the settlement agreement into a judgment, precludes the Fund from asserting that the contract is invalid. Centra utilizes convoluted logic to arrive at this conclusion.
 
 
 31
 Claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir.1984) (citing I.A.M. Nat'l Pension Fund v. Industrial Gear Mfg. Co., 723 F.2d 944, 946-47 (D.C.Cir.1983)). The first two criteria of this test are easily met. The bankruptcy court order fulfilled the first prong because for purposes of claim preclusion, judgments entered by consent are final judgments on the merits. Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 96-97 (3d Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Second, the Fund was a party to the prior suit, and Centra, which acquired Mason-Dixon, is in privity with Mason-Dixon, the other party to the prior suit.
 
 
 32
 Centra asserts that the same cause of action underlies the bankruptcy court's January 5, 1990 order and this case. Whether two lawsuits are based on the identical cause of action "turn[s] on the essential similarity of the underlying events giving rise to the various legal claims." Athlone Industries, 746 F.2d at 983. Courts should not apply this conceptual test mechanically, but should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out the same occurrence in a single suit. Id. at 983-84.
 
 
 33
 The bankruptcy proceeding arose from Mason-Dixon's withdrawal from the Pension Fund and its resulting debt for its portion of the unfunded vested liability. The factual predicates for the matter now before us are allegations that Mason-Dixon's misconduct induced the Fund to sign the agreement and that the Fund properly rescinded the settlement due to Mason-Dixon's breach of its contractual obligations. At the time the bankruptcy court approved the settlement agreement, the Fund was unaware of Mason-Dixon's alleged misrepresentations or of its own mistake concerning material facts. Unless the Fund was clairvoyant, it could not foresee that Mason-Dixon would breach the agreement. Yet Centra insists that the Fund should have brought to the court's attention claims of which it was completely unaware and claims based on conduct that had not yet occurred. Centra's argument is indefensible.
 
 
 34
 We conclude that this case does not involve the same cause of action as the bankruptcy court proceeding. Claim preclusion does not bar the Fund from challenging the enforceability of the settlement agreement.
 
 2. Issue Preclusion
 
 35
 Centra also contends that the bankruptcy court's August 1991 order, in which the court declined to vacate its earlier order approving the settlement agreement, bars the Fund from relitigating the issues of misrepresentation and mistake. This argument we find sound.
 
 
 36
 Issue preclusion, formerly titled collateral estoppel, proscribes relitigation when the identical issue already has been fully litigated. Issue preclusion may be invoked when: (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question. Temple University v. White, 941 F.2d 201, 212 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). The Pension Fund filed a motion in the bankruptcy court seeking to vacate that court's order approving the settlement agreement and to rescind the settlement agreement. The Fund presented, through witness testimony and documents, its misrepresentation, mistake and breach of contract arguments at that time. The bankruptcy judge declined to vacate its prior order, but explicitly refused to decide whether the agreement ultimately should be rescinded. Although it did not finally determine the rescission issue, the bankruptcy court made specific findings that neither Mason-Dixon nor its counsel made any misrepresentations, and that the Fund could not void the settlement on the grounds of mistake because Centra's ownership of Mason-Dixon was a matter of public record and knowledge of this fact would be imputed to the Fund. In re Mason and Dixon Lines, Inc., No. B-84-00377-C-11, slip op. at 2-3 (Bankr.M.D.N.C. Aug. 19, 1991). No appeal was taken from that determination.
 
 
 37
 The Fund argues that there was no final judgment on the merits concerning whether mistake or misrepresentation justified a rescission because the bankruptcy court explicitly reserved the rescission issue. The doctrine of issue preclusion, however, does not require a decision on the ultimate issue. See Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1073-74 (3d Cir.1990). A final determination regarding a given specific issue (mistake or misrepresentation) occurs when that narrow issue is actually litigated and decided. Id. In Bradley, this court cited with approval an example from the Restatement (Second) of Judgments that is analogous to the situation in this case:
 
 
 38
 P is discharged from his employment in a state agency on the ground of gross insubordination. P brings an action under appropriate state procedure contesting the propriety of the discharge, but expressly reserves any possible federal claim, a reservation in which the state court acquiesces. Judgment is against P on a finding that he was guilty of gross insubordination. The rule of claim preclusion does not prevent P from maintaining any action in federal court, but the issue of insubordination may not be relitigated, assuming the state court proceeding afforded a fair opportunity to litigate the issue.
 
 
 39
 Id. (emphasis in Bradley ) (quoting Restatement (Second) of Judgments § 86 cmt. f, illus. 7 (1982)). Since the bankruptcy court's August 1991 order made findings that no misrepresentation or mistake occurred, the Fund may not relitigate these issues. The ultimate issue of the propriety of the Fund's rescission has not been decided, however, and the Fund may argue on remand that Mason-Dixon's alleged breach of the settlement agreement justified the Fund's rescission of that settlement agreement.
 
 C. Propriety of Arbitration
 
 40
 The district court did not decide whether Mason-Dixon had breached the settlement agreement because it held that an arbitrator should resolve that dispute in the first instance. The district court, in a cursory review of the merits, expressed its view in dicta that Mason-Dixon had breached the agreement and that the breach was sufficiently substantial to justify rescinding the agreement. We will remand this dispute for full development of the facts and a decision on the merits. We now turn to the question of the appropriate forum to resolve this dispute. Centra seeks to enjoin the arbitration proceeding because the enforceability of the settlement agreement is not an arbitrable issue. It argues that the district court must determine whether the Fund may rescind the settlement agreement due to Mason-Dixon's alleged breach. Centra is correct that a court may not force the parties to arbitrate this issue.[12]
 
 
 41
 MPPAA requires arbitration only to resolve disputes "concerning a determination made under sections 1381 through 1399." 29 U.S.C. § 1401(a)(1). By generally mandating arbitration in the first instance with review by a federal court, MPPAA has created arbitrators who are experts in applying the technical provisions of how and when to assess withdrawal liability. Whether a specific issue is arbitrable, however, does not require, or indeed even allow, an inquiry into whether a MPPAA arbitrator possesses expertise in that area. MPPAA is clear that an arbitrator lacks the power to decide issues that do not implicate one of the enumerated provisions. Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters & Employers Pension Fund, 847 F.2d 113, 118-19 (3d Cir.1988), cert. denied, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989).
 
 
 42
 Our decision in Colteryahn is directly on point. In that case, the employer claimed that it was fraudulently induced to join and remain in the Fund. We held that fraud and misrepresentation are not arbitrable issues under MPPAA. Id. Just as fraud is not among the technical provisions describing the formulas by which to calculate withdrawal liability and the timing of payments (sections 1381-1399), the breach of contract argument that the Fund asserts does not fall into any category that MPPAA deems arbitrable.
 
 
 43
 From the exhaustive list of arbitrable issues contained in the statute, the Fund points to only a single section that arguably supports its conclusion that the validity of the settlement agreement should be resolved through arbitration. Whether a transaction's principal purpose is to evade or avoid liability is an arbitrable issue. 29 U.S.C. § 1392(c) (1988). The Fund argues that the settlement agreement's release of Centra, a solvent company that controlled Mason-Dixon, was an attempt to avoid liability. This argument lacks merit because the purpose of settling a case is always to avoid the possibility of a larger adverse verdict at trial. Settlement agreements that both parties freely sign cannot be characterized as attempts to avoid liability within the meaning of the statute. Even if the Fund's breach of contract allegation proves true, the agreement's principal purpose would not be to avoid or evade liability for Centra. The primary objective of the transaction was to settle the Fund's claim with the bankrupt Mason-Dixon and allow Mason-Dixon to reorganize.
 
 
 44
 The only other MPPAA provision, under which the challenge to the validity of the settlement agreement could fall, is the broad introductory provision--the Fund shall "determine the amount of the employer's withdrawal liability." 29 U.S.C. § 1382(1) (1988).[13] Under an expansive reading of this phrase, the validity of the settlement agreement literally "determine[s] the amount" of the employer's liability because if the agreement is enforceable, Centra is immune from liability. This interpretation would moot the exhaustive list of arbitrable questions because every issue in a MPPAA case ultimately impacts the existence or amount of the employer's withdrawal liability. Such an expansive reading also would overrule Colteryahn because whether a settlement agreement is voidable due to fraudulent inducement also indirectly affects the existence of the employer's liability. We decline to adopt this unnaturally expansive reading of MPPAA's introductory section.
 
 
 45
 The Fund contends that even if MPPAA does not mandate arbitration as the appropriate forum to decide the remaining issues, Centra's initiation of arbitration estops it from now seeking to enjoin this process. This argument must fail because ERISA requires an employer to initiate arbitration to preserve any defenses to the Fund's assessment of liability. See 29 U.S.C. § 1401(b)(1). It would be unfair to expect an employer to risk waiving its right to assert defenses to payment in order to preserve the right to argue that a federal court should decide the case.[14]
 
 D. Mandatory Payment of Interim Payments
 
 46
 The district court held that Centra must make interim payments to the Pension Fund pending final resolution of the matter. The district court followed MPPAA's clear mandate that "withdrawal liability shall be payable ... beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount...." 29 U.S.C. § 1399(c)(2) (1988); see United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 134 (3d Cir.1986) (to ensure the stability of pension plans, interim payments must be paid pending arbitration), aff'd per curiam, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). The pay now, dispute later principle of MPPAA is well established:
 
 
 47
 Section 1399(c)(2) calls on the employer to pay 'notwithstanding' contentions that may prevail in the end. The MPPAA puts payment ahead of decision. Centra wishes it were the other way around, but the employers lost that fight a decade ago in Congress.
 
 
 48
 Trustees of the Chicago Truck Drivers Pension Fund v. Central Transport, Inc., 935 F.2d 114, 118 (7th Cir.1991) (citations omitted). This court has stressed the importance of interim payments by employers--"the court has no discretion to do anything other than order interim payments in accordance with the Fund's demand." Pantry Pride, Inc. v. Retail Clerks Tri-State Pension Fund, 747 F.2d 169, 173 (3d Cir.1984). The Fund is entitled to collect interim payments even when an employer launches a facial constitutional challenge to the statute. Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 298 (3d Cir.1982). Additionally, payments must be made whether the underlying dispute is resolved through arbitration or by a federal court. See id.[15]
 
 
 49
 Centra proposes a novel exception to the mandatory interim payment rule. It urges that when the parties have signed a settlement agreement, the validity of which is challenged, the agreement bars interim payments until the Fund proves that the agreement is unenforceable. Centra relies on Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund, 902 F.2d 185 (2d Cir.1990), to support its contention. There, the court refused to allow a Fund to rescind a settlement agreement on the grounds that an intervening court of appeals decision changed relevant legal principles and would have altered the bargain. The court acknowledged the strong public policy favoring settlements because they conserve judicial resources and represent compromise. Id. at 190. The court also noted that "[p]reserving settlement agreements promotes the MPPAA policy that 'disputes over withdrawal liability issues [sh]ould be resolved quickly.' " Id. (quoting ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, 846 F.2d 879, 887 (2d Cir.1988)).
 
 
 50
 The procedural context of Anita Foundations is vastly different from this case. In Anita Foundations, a Fund, which had settled a suit with an employer, sent a notice and demand for payment asserting that a mistake of law defense voided the settlement agreement. The employer initiated a suit seeking a declaratory judgment that the agreement was valid. The court therefore addressed the merits of the case, not whether interim payments pending resolution were appropriate. Whether the public policy favoring finality for settlements trumped the ERISA policy of immediate payment to Funds was not an issue. The Anita Foundations court even acknowledged that if the employer had waited for the Fund to bring a collection suit, the employer would have been liable for interim payments. The employer's statutory entitlement to bring a peremptory declaratory action suit is necessary specifically because of the "pay-first-question-later system." Id. at 187.
 
 
 51
 ERISA's specific strong policy mandating immediate payment cannot be overridden by general notions that settlements should be accorded finality. Until the district court finally rules on the enforceability of the settlement agreement, Centra must make interim payments to the Fund.
 
 E. Attorney's Fees
 
 52
 We generally review awards of attorney's fees to a prevailing party for abuse of discretion. Ellison v. Shenango, Inc. Pension Board, 956 F.2d 1268, 1273 (3d Cir.1992). However, when a district court fails to apply the appropriate standards for granting legal fees, our standard of review is plenary. Schake v. Colt Indus. Operating Corp. Severance Plan for Salaried Employees, 960 F.2d 1187, 1190 (3d Cir.1992).
 
 
 53
 Centra argues that when determining whether to award attorney's fees in an ERISA case, district courts must consider several factors. See Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir.1983) (outlining five factors for courts to consider when awarding attorney's fees under ERISA). Centra asserts that the district court's failure to consider explicitly each Ursic criterion renders the award of legal fees improper.
 
 
 54
 Centra's statement of the law is incorrect. It is generally true that in an ERISA action, a court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (1988). The Ursic court articulated criteria for courts to consider in these circumstances. When a Fund prevails in a suit to compel payment of withdrawal liability, however, the district court's award of reasonable attorney's fees is mandatory, not discretionary. 29 U.S.C. § 1132(g)(2)(D) ("the court shall award the plan ... reasonable attorney's fees") (emphasis added); see Trustees of the Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., 862 F.2d 1020, 1023-24 (3d Cir.1988), cert. denied, 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989).
 
 
 55
 Since the Fund prevailed in compelling withdrawal liability interim payments from Centra, ERISA obligated the district court to order that Centra pay the Fund's legal fees. Because the court had no discretion to do otherwise, there was no need for any analysis of factors. Further, the district court did not abuse its discretion when setting the amount of the legal fees. The award of attorney's fees was proper.
 
 IV. CONCLUSION
 
 56
 In sum, we hold that Centra was in common control with Mason-Dixon on the date Mason-Dixon withdrew from the Fund. The bankruptcy court's August 19, 1991 order precludes the Fund from relitigating the issues of mistake and misrepresentation. The remaining issue, whether the Fund may rescind the settlement agreement due to Mason-Dixon's breach, must be decided on remand by the district court. Pending the final resolution of this dispute, Centra must make interim payments to the Fund. Therefore, we will affirm in part and reverse in part and remand the matter to the district court for trial on the remaining issues consistent with this opinion.
 
 
 
 [1]
 For a more extended discussion of the history and requirements of MPPAA, see generally Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1243-44 (3d Cir.1987); Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters & Employers Pension Fund, 847 F.2d 113, 116-17 (3d Cir.1988), cert. denied, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989)
 
 
 [2]
 According to the Fund, payments ceased in April of 1984, but they cannot ascertain a specific date. Since this is a motion for summary judgment and facts must be viewed in the light most favorable to the nonmoving party, we accept the April 9, 1984 withdrawal date alleged by Centra
 
 
 [3]
 Due to widespread union corruption, a district court appointed a federal trustee to oversee the Fund. See generally United States v. Local 560, Int'l. Bhd. of Trustees, 581 F.Supp. 279 (D.N.J.1984) (describing union corruption and need for federal trustee), aff'd, 780 F.2d 267 (3d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). In June of 1986, Zazzali, Zazzali & Kroll was appointed special counsel to the trustee to handle hundreds of files in total disarray. The Mason-Dixon withdrawal liability case was one such file. These circumstances appear to explain the misplaced notice for the hearing
 
 
 [4]
 The agreement provides in pertinent part that the Fund and Mason-Dixon each release one another as well as their:
 respective agents, attorneys, successors, heirs, executors, administrators, personal representatives and all other persons, firms, corporations, associations or partnerships related (in any manner) to any of them from any and all claims, actions, causes of actions (sic), demands, rights, damages, costs, expenses and compensation of any kind or nature, for any actions taken by each of them, whether known or unknown, certain or contingent, foreseen or unforeseen, which they or any other persons claiming through them now has (sic) or may have had against each other, including but not limited to the claim for withdrawal liability.
 App. at 249.
 
 
 [5]
 On November 8, 1984, the last state regulatory agency, the Kentucky Department of Vehicle Registration, granted its approval
 
 
 [6]
 It is undisputed that if the settlement agreement is valid, its broad release clause would relieve Centra from liability
 
 
 [7]
 The bankruptcy court made a finding that:
 [Mason-Dixon's attorney] did not misrepresent the identity of his client during the course of these negotiations nor did [he] mislead the fund or its attorneys concerning any aspect of the settlement.
 In re Mason and Dixon Lines, Inc., No. B-84-00377-C-11, slip op. at 2-3 (Bankr.M.D.N.C. Aug. 19, 1991).
 
 
 [8]
 The bankruptcy court made a finding that:
 [T]he facts relevant to the resolution of the dispute between the parties were set out within the official court files at the time that the settlement was negotiated. The court finds it appropriate to impute knowledge of those facts to the parties in this case.
 In re Mason and Dixon Lines, Inc., No. B-84-00377-C-11, slip op. at 3 (Bankr.M.D.N.C. Aug. 19, 1991).
 
 
 [9]
 Centra is involved in litigation with different pension funds throughout the country on this issue. The majority of courts of appeals addressing this issue have held that Centra controlled Mason-Dixon prior to receiving all state regulatory approvals. See Trustees of Chicago Truck Drivers Pension Fund v. Central Transport, Inc., 888 F.2d 1161, 1162 (7th Cir.1989); Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 120-21 (4th Cir.1991); McDonald v. Centra, 118 B.R. 903, 915 (D.Md.1990), aff'd, 946 F.2d 1059 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992). A pair of companion cases, affirmed by the Court of Appeals for the Sixth Circuit, held that Centra was not in common control with Mason-Dixon, but in those cases the withdrawal date occurred prior to the time the ICC granted either temporary or permanent authority to operate, a crucial difference. See Central Transport, Inc. v. Central States Pension Fund, 639 F.Supp. 788, 790-91 (E.D.Tenn.1986) and Central Transport, Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 640 F.Supp. 56, 58-60 (E.D.Tenn.1986), aff'd per curiam, 816 F.2d 678 (6th Cir.), cert. denied, 484 U.S. 926, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987)
 
 
 [10]
 We note that before a court makes the threshold determination that a company is a member of a control group and thus is an employer under MPPAA, a Fund may not collect even interim payments. Flying Tiger Line, 830 F.2d at 1251
 
 
 [11]
 Title 29 U.S.C. § 1301(b)(1) provides in pertinent part:
 [A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer....
 
 
 [12]
 The Fund alleges that Centra did not raise in the district court the argument that arbitrating the validity of the settlement agreement is beyond the scope of MPPAA. Therefore, the Fund contends, Centra has waived its right to argue this issue on appeal. We should address the merits of this dispute irrespective of waiver because "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.' " Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (quoting Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)). Therefore, even if Centra had not challenged the jurisdiction of the arbitrator, we must raise jurisdictional matters sua sponte. See Employers Ins. of Wausau v. Crown Cork & Seal Co., 905 F.2d 42, 45 (3d Cir.1990)
 
 
 [13]
 The Fund relied on this section for the first time at oral argument
 
 
 [14]
 Centra took every precaution to preserve its right to object to arbitration. In its demand for arbitration, Centra provided:
 [T]his demand is made without prejudice to the right of Central to assert that arbitration need not be initiated until ... resolution of any lawsuit which Central may file to enforce the ... Settlement Agreement and January 5, 1990 Order of the Bankruptcy Court.
 App. at 293.
 
 
 [15]
 Although we have not addressed this issue, in extraordinary cases, other courts of appeals have suspended the interim payment requirement if the employer demonstrates irreparable harm. See Robbins v. McNicholas Transp. Co., 819 F.2d 682, 685-86 (7th Cir.1987); Central States Southeast and Southwest Areas Pension Fund v. T.I.M.E.-DC, Inc., 826 F.2d 320, 328 (5th Cir.1987). Centra, with assets of a quarter of a billion dollars and retained earnings in excess of 86 million dollars, cannot show and does not allege irreparable harm